**In the Interest of B.B. and P.B.**

**No. 09–97–006 CV.**

Court of Appeals of Texas,
Beaumont.

Submitted April 30, 1998.

Decided June 25, 1998.

Richard J. Clarkson, Reaud, Morgan & Quinn, Beaumont, for appellant.

Tom Maness, Criminal Dist. Atty., Wayln G. Thompson, Asst. Dist. Atty., Beaumont, for state.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

BURGESS, Justice.

Following a trial to the bench, Donna Beard's parental rights to her son, B.B., and her daughter, P.B., were terminated by the trial court. *See* TEX. FAM.CODE ANN. § 161.001 (Vernon 1996). Beard appeals, raising nineteen points of error.

### THE PETITION

Point of error one contends the trial court erred in terminating Beard's parental rights upon unpleaded grounds. Referring to Chapter 15 of the Texas Family Code, the original petition alleged Beard "knowingly placed and knowingly allowed the child(ren) to remain in conditions and surroundings which endangers the physical and emotional well-being of the child(ren), and have engaged in conduct and knowingly placed the child(ren) with persons who engaged in conduct which endangers the physical and emotional well-being of the child(ren).  .  .  ."  It is the reference to Chapter 15 that Beard complains of on appeal.

The Family Code was amended and re-numbered prior to the filing of Child Protective Services' (CPS) petition in the present case. The petition should have referenced TEX. FAM.CODE ANN. § 161.001 (Vernon 1996) providing the court may terminate the parent-child relationship if it finds by clear and convincing evidence:

(1) that the parent has:

. . . .

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

We disagree with Beard that the petition's reference to the old chapter number is so "non-sensical and misleading" as to constitute fundamental error requiring reversal. The allegations track the language in § 161.001 and consequently the petition contained "the statutory grounds upon which the request [was] made." TEX. FAM.CODE ANN. § 102.008(10) (Vernon 1996). Point of error one is overruled.

## VIOLATION OF FAMILY RIGHTS

■ Beard's second point of error asserts the trial court erred in terminating her relationship with the children because the termination occurred in violation of the family's rights. The rights Beard argues were violated are those of the children's father, Quen Pham Nguyen. Beard says CPS failed to prove by clear and convincing evidence that Quen Pham Nguyen was the father of B.B. and P.B., and therefore the findings against him in the termination decree must be set aside.

Nguyen has not appealed the termination of his parental rights. Any violation of his rights must be asserted by Nguyen. Point of error two is overruled.

## SUFFICIENCY OF THE EVIDENCE

■ Points of error three through thirteen challenge the legal and factual sufficiency of the evidence to support certain of the trial court's findings. We first note that the findings of the trial court challenged in points of error five through eleven[1] cannot support the trial court's decree of termination as these grounds were not pleaded in CPS' petition. While under § 161.001(1)(A), (B), (F), (N)(i), (ii) and (iii), these are grounds for termination, they must be pleaded in order to support the trial court's judgment. *See In the Interest of S.R. M.,* 601 S.W.2d 766, 769–70 (Tex.Civ.App.—Amarillo 1980, no writ) (parental rights, being of constitutional dimension, may not be terminated on unpleaded grounds); *see also In the Matter of Marriage of Hill,* 893 S.W.2d 753, 755 (Tex.App.—Amarillo 1995, writ denied); Tex. Fam.Code Ann. § 102.008(b)(10). Accordingly, we sustain points of error five, six, seven, eight, nine, ten and eleven. Our inquiry does not end here, however. Only one of the pleaded grounds for termination must be upheld in order to support the trial court's decision.

The grounds pleaded were that Beard knowingly placed or knowingly allowed B.B. and P.B. to remain in conditions or surroundings which endanger the physical or emotional well-being of B.B. and P.B.; and that Beard engaged in conduct or knowingly placed B.B. and P.B. with persons who engaged in conduct which endangers the physical or emotional well-being of B.B. and P.B. Point three claims the evidence is legally and factually insufficient to support the first of these while point four challenges the legal

1. Point Five—Beard failed to support the children.

Point Six—Beard voluntarily left the children alone or in the possession of another not the parent and expressed an intent not to return.

Point Seven—Beard voluntarily left the children alone or in the possession of another not the parent without expressing an intent not to return, without providing adequate support, and remained away for at least three months.

Point Eight—Beard constructively abandoned the children.

Point Nine—CPS made reasonable efforts to return the children.

Point Ten—Beard had not visited or maintained contact with the children.

Point Eleven—Beard demonstrated an inability to provide a safe environment.

and factual sufficiency of the latter.[2] Before addressing the merits of these points, we set forth the standards of review and the evidence before the trial court, in chronological order.

### Standards of Review

■ In the trial court, both the statutory ground or grounds for termination and the child's best interest must be proven by clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001 (Vernon 1996). In deciding a legal sufficiency point, we consider only the evidence and inferences supporting the trial court's findings and disregard all contrary evidence and inferences. *Lucas v. Texas Dep't of Protective and Regulatory Serv.*, 949 S.W.2d 500, 502 (Tex.App.—Waco 1997, writ denied). If more than a scintilla of evidence supports the trial court's findings, the appealing parent can not prevail on a legal sufficiency point. *In the Interest of R.D.*, 955 S.W.2d 364, 368 (Tex.App.—San Antonio 1997, writ denied).

■ To withstand a challenge of factual sufficiency, the evidence must permit a rational trier of fact to hold a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* We consider all of the evidence and determine whether the factfinder could reasonably conclude the existence of the fact is highly probable. *In the Interest of B.R.*, 950 S.W.2d 113, 119 (Tex. App.—El Paso 1997, no writ). An appellant will succeed in challenging the factual sufficiency of the evidence only if the trier of fact could not reasonably have found the fact was established by clear and convincing evidence. *Id.*[3]

### The Evidence

Patricia Van Staveren testified CPS obtained temporary managing conservatorship of B.B. and P.B. approximately one year prior to the hearing. B.B. had been placed out of the home in September of 1994 while P.B. was removed in September of 1995. At the time of P.B.'s removal, Beard was under indictment for injury to a child (B.B.). According to Sandra Mayfield, Foster Care Supervisor, Beaumont, B.B. had been placed out of the home once before (with bruises on his body and a head injury), prior to his removal in September of 1994 for physical abuse.

P.B. was born in September 1995 and placed with CPS before she was a week old. At the time she was removed, P.B. appeared to be in good health with no marks or bruises. CPS had no evidence Beard had abused P.B. but removed her due to the risk associated with the physical abuse of B.B. Beard said she had not abused P.B. physically, nor neglected her.

At the termination hearing, CPS case workers identified the problem areas as Beard's alcohol abuse, a history of domestic violence, Lee Beard's[4] interest in child pornography, Beard's lack of parenting skills, the instability of Beard's housing and employment situation, and Beard's past emotional problems.

### Alcohol Abuse

In October of 1995, Beard testified to attending AA (Alcoholics Anonymous) meetings about once a week, when she got a ride, but had not been recently. Beard understood CPS felt she had a drinking problem, and said she contacted several treatment facilities but was turned down. Beard then testified she does not have a problem with alcohol.

Prior to the December 4, 1995, hearing, Staveren received the results of Beard's drug and alcohol assessment recommending inpatient treatment. Staveren spoke with Beard

---

**2.** Establishment of the second prong requiring the trial court to find by clear and convincing evidence that termination is in the best interest of the child is addressed in point of error twelve. TEX. FAM.CODE ANN. § 161.001(2) (Vernon 1996).

**3.** Currently there is a split of authority among the Courts of Appeals regarding the proper standard of review in deciding a factual sufficiency point in cases where the evidence must be "clear and convincing." *See In the Interest of D.L.N.*, 958 S.W.2d 934, 940 (Tex.App.—Waco 1997, no writ). We do not address the conflict in detail as both parties agree with this court on the standard of review to be applied.

**4.** Lee Beard is Donna Beard's ex-husband but continued to live with her for a number of years.

regarding inpatient treatment and Beard indicated she would like to cooperate but was going to have some difficulty due to an illness in the family. At that hearing, Staveren testified that during conversations with Beard, she denied using alcohol and said the last time she had a drink was months ago. Beard again indicated she did not have a problem with alcohol.

Kelli Ross, the manager of Beard's apartment complex, testified at the April 2, 1996, hearing that she had seen Beard intoxicated on numerous occasions, as recently as two weeks prior to the hearing. Ross said she had seen Beard intoxicated six or seven times in the last two or three months. Ross described Beard on those occasions as staggering, with slurred speech, and the smell of alcohol on her breath. Ross witnessed Beard drinking alcohol in her apartment approximately two months prior to the hearing.

Following an alcohol assessment, it was recommended Beard go for inpatient treatment and the trial court ordered alcohol inpatient treatment following the April 2, 1996, hearing. Initially, Beard refused but after the termination hearing was set she made a greater effort to find a facility. As of the termination hearing, she had not gone through an inpatient alcohol treatment program and had not received or gone to any alcohol treatment during the year prior to that hearing.

Beard showed up for at least one visit with the children smelling of alcohol and Lee admitted she "drinks a lot." At the termination hearing, Beard said she still drank alcohol off and on.

Beard admitted she drank during her pregnancy with B.B. Beard said she was not counseled regarding drinking during her pregnancy with B.B. While pregnant with P.B., Beard was counseled on the dangers of drinking while pregnant and the problems it could cause her unborn child. She denied drinking while pregnant with P.B.

### Domestic Violence

### 1993 Injury to B.B.

Diane James, Program Consultant for Child Protective Services, investigated the Beards in June 1993 for neglectful supervision or physical neglect, which was ruled out. B.B. had a minor concussion on the right side of his head from falling off the bed. There were concerns that Beard was drinking and fighting with Lee, over the home environment because there were "lots of animals in the home with feces, lots of dog hair," and the complaint stated Lee was a sex pervert. James investigated and found a lot of dog hair all over the furniture and floor and dogs in the home but the living area where the baby bed was located was extremely clean. James said the home was somewhat neglectful except for the baby's area and contained adequate food for the baby. James did not see Beard drinking at that time.

Regarding B.B.'s concussion, Beard and Lee said he fell off the bed. About a week later, they took him to the doctor. James testified she watched B.B. for twenty minutes in the middle of a bed and "he could not roll over." James said B.B. would have had to roll over two and a half times to fall off the bed. James put B.B. in his baby bed and he rolled over once but his arm was caught beneath his body; B.B. was unable to pull his arm out. James testified that at that time CPS asked B.B. be taken to the emergency room to check his head because it was still swollen and was soft. The doctor diagnosed a minor concussion and felt the explanation was consistent with the story being told. James was still concerned, however, because she had seen the child was unable to turn over.

Beard testified Lee was taking care of B.B. when he fell off the bed; she was asleep in another room. Beard admitted B.B. was not taken to the hospital until after CPS became involved. Beard said she had looked at B.B.'s head very carefully and found nothing wrong.

### 1994 Injury to B.B.

Nancy Simon, Child Protective Services Specialist for Texas, testified that in September of 1994 she investigated alleged violence involving Beard, Lee and B.B. Simon stated that to her best recollection, Beard was angry with Lee and scratched B.B.

Staveren's information on that incident was that Beard had been drinking, and in a struggle between Beard and Lee, B.B. was injured. B.B. had scratches on his face and his hair had been pulled out.

Lee testified that in September of 1994 Beard and B.B. were living with him (the Beards had been divorced for approximately five years at that time). According to Lee, Beard threatened him saying, "don't go outside because you'll never see [B.B.] again. I'll kill [B.B.]." Beard then pulled B.B.'s hair "real hard" and tried to pull him away from Lee. Lee was afraid to let her have B.B. "because she was so violent." Lee then said he felt her hitting B.B. but did not actually see her hit B.B. At that point, Lee gave B.B. back to Beard and went to the Brown's home; George Brown called the police. Lee testified Beard was drinking that day.

Beard was given deferred adjudication and two years probation for misdemeanor injury to a child. Beard did not recall threatening to kill B.B. but testified Lee's recollection of the incident was fairly accurate.

### Lee's Interest in Child Pornography

In the process of her investigation in 1993, James interviewed Lee in his bedroom and saw "lots of pictures of nude women" and "found pictures of nude children on the walls." On the mirror were two photographs—one of "two Anglo children completely nude just standing straight up like they were posing for someone, probably around the age four to five years" and one of a teenager fully dressed. James spoke to both Beard and Lee about these pictures. Lee acknowledged the pictures were his and indicated he had an interest in child pornography. Beard said Lee owned "dirty" magazines picturing children and indicated he watched videotapes. She was aware the pictures were in the house and understood it appeared Lee was sexually interested in small children but did not seem to understand she should be concerned about Lee's interest in that type of child nudity. In fact, Beard told James it did not bother her and she was not concerned.

In 1995, CPS again went to the home when they learned Beard had another baby (P.B.).

According to Mayfield, while there they noticed child pornography magazines and video tapes which Lee admitted were child pornography.

Beard testified there were a bunch of nude photographs on the walls in the home and a few were of children. Beard said it did not bother her that those photos were around her children because B.B. was too young to know anything. Beard admitted some of the children pictured naked were "pretty young." She also said Lee watched videos with nude people in them, but they were not having intercourse. Beard did not feel the photographs and videos were pornographic but when shown a photograph of the front cover of a magazine taken from the home, Beard agreed having it around the children was a bad thing.

According to Beard, the detective (she could not remember his name) told Lee it was not pornography and the material was returned. Beard said she had looked at the books and there were children in them but no sexual contact. Staveren testified CPS' concerns regarding Lee's interest in such materials were made known to Beard but she continued her relationship with Lee.

### Instability of Beard's Financial Situation

Staveren was concerned about Beard's ability to care for the children financially. Following the October 12, 1995, hearing, Beard was ordered to pay child support but had not paid any as of the termination hearing. At the December 4, 1995, hearing, Beard testified she had been looking for a job and was still attempting to get S.S.I. benefits. Beard considers herself disabled due to a bad back and legs. She said she applied for two jobs the week before that hearing. Beard has not been employed since the children were placed with CPS. Beard is in section eight housing and receives food stamps. Lee pays the electric and phone bills, life insurance on her and the children, and helps her with everything else, including transportation. According to Mayfield, Lee helps Beard financially because she is unemployed.

While pregnant with P.B., Beard discussed her relationship with the children's father with a counselor. Beard admitted he would call her in the middle of the night, come over and have sex with her, leaving five to twenty dollars each time. Beard agreed that in the summer of 1995, while she was four or five months pregnant, he was still coming over and paying her to have sex with him. Beard had told the counselor one of her fears about ending the relationship was that he would not bring more money. On recross-examination, Beard answered no when asked if she was suggesting she was engaged in prostitution.

### Beard's Parenting Skills

According to Staveren, CPS's records indicate Beard has a history of domestic violence and a few call-outs to the police had been made. Beard took parenting classes in the year before B.B.'s removal but there was no improvement seen in Beard's behavior or attitude following those classes. Beard was sent to anger management and family parenting courses after B.B. was removed. Staveren testified there was no appreciable change in Beard's behavior after attending these classes, either.

Staveren testified Beard made all of her visits with the children. On several occasions she brought can goods and food to the children. Staveren said Beard attempts to bond with the children but the interaction was not there. P.B. was less than one week old when she was removed from Beard's care. According to Staveren, Beard's attention was focused on P.B. when she was in the room and Beard would let B.B. do as he wanted. Beard appeared very tense with P.B., who cries a lot.

Lee said Beard was a good mother and took good care of B.B. She fed him on a regular basis, took care of him when he was sick, and took him to the doctor when necessary. Lee agreed it would be in the best interest of the children if they were returned to Beard.

### Beard's Continued Association with Lee

In April of 1996, when asked who brought her to the hearing, Beard at first refused to tell the court. Upon being instructed to answer the question, Beard said Lee brought her because she had no other transportation. She also said at times Lee brought her to the visits with the children, otherwise she walked. Staveren testified Beard had recently denied having a relationship with Lee but the week prior to the hearing they were seen together.

Ross, Beard's apartment manager, testified on April 2, 1996, that she sees Lee's vehicle pass through every day, including the day before. According to Ross, he stops and lingers on the premises or visits with Beard. Ross had not seen Lee drinking with Beard but knew him to have been in Beard's presence when she was intoxicated.

At the termination hearing, Beard said she understood CPS disagreed with the children being around someone who liked child pornography but that she continued to stay with and see Lee. Beard admitted that at one prior hearing she refused to tell the court who had brought her because she did not want the court to know she was still associating with Lee.

### Compliance with CPS' Family Service Plan

CPS formulated a family service plan to try to reunite Beard and her children. According to Staveren, in April of 1996, Beard had complied minimally with CPS's requests. She had made all of her visits with the children, received her psychological evaluation and followed through with the recommendation, and had a drug and alcohol assessment. However, Beard's continued association with Lee was a problem as well as her alcohol abuse.

Mayfield also testified at the December 1995 hearing regarding Beard's compliance with the plan. CPS had asked that Beard no longer associate with Lee because of the child pornography but Beard was still having contact with Lee. On three visits with the children, Lee brought Beard and was helping her with bills. Beard admitted one of the conditions of her probation for injury to a child was that she would not be around Lee but that Lee brought her to the hearing that day and had been helping her get around. Beard said she understood she was violating

a condition of her probation by still hanging around Lee.

CPS asked Beard to get another assessment at ATAR (Alcohol Treatment and Rehabilitation). Beard told Mayfield the morning of the hearing she had contacted ATAR and they required a $50 payment. Mayfield said it was unusual for ATAR to require such a payment and to her knowledge ATAR had never required anyone to pay. Mayfield said Beard's only reason for not being enrolled in ATAR was that she did not have the money.

CPS had also asked Beard to get employment which she had not done. While Beard made her visits with the children, on one occasion she smelled of alcohol.

Mayfield felt Beard understood what CPS expected and was cooperating. Mayfield also said Beard was aware if she did not cooperate termination was possible. Beard testified she was trying to work with CASA (Court Appointed Special Advocate) and the foster care worker.

At the termination hearing, Staveren stated Beard showed up for any appointments set up by CPS and went through the procedures. Staveren believed Beard would do the best she is capable of doing with the children. It was her position that Lee was not to be involved in the home if the children were returned. Staveren testified Beard has not ever taken responsibility for her violent behavior toward B.B. or her alcohol problem, and has never acknowledged a problem with having a person interested in child pornography around her children.

Beard testified at the termination hearing that she attended AA, successfully completed anger management, and completed a psychiatric evaluation. She also stated she made most of the visitations set up with the children and attended parenting classes. Further, Beard testified she was unemployed when ordered by the court to pay child support. She had applied for S.S.I. and was still trying to get benefits. Beard testified she had tried to find a job. CPS did not provide any type of job training skills and never required Beard to acquire job skills. Beard graduated from Port Neches–Groves High

School taking both regular and special education classes.

### Recommendations

According to Staveren, both children were doing well in foster care. B.B. had been diagnosed with Fetal Alcohol Syndrome and requires special help. He has a speech problem and is very delayed, developmentally. The adoption possibilities of both B.B. and P.B. were good with their current care givers.

Carinne Freeman, a CASA volunteer, testified she visited with Beard, the homes where P.B. and B.B. were placed, the foster parents, CPS worker Patricia Van Staveren, and Beard's probation officer, Officer Pat Barthell. Freeman recommended the termination of Beard's parental rights. Freeman said her report reflected a lot of what had been said at the hearing.

Vickie Craver testified B.B. had been in their home for almost a year and a half at the time of the hearing. She said B.B. was physically and mentally behind in his development and had been diagnosed with fetal alcohol syndrome. Craver said she has seen a lot of the symptoms of the syndrome in B.B. According to Craver, B.B. has been diagnosed with severe language and speech lags and will require help to progress. At the time of the hearing, no second opinion had been given by another physician.

### Analysis

#### Termination of Parental Rights to B.B.

■ The evidence established Beard threatened to kill B.B. immediately before she assaulted him, physically injuring him. The record reflects Beard pleaded guilty to the offense of injury to a child pursuant to that incident. The evidence further established Beard has a violent temper when drinking and that she had been drinking prior to her attack on B.B. The record contains evidence Beard has not stopped drinking, at times to the point of inebriation.

In *Texas Dep't of Human Serv. v. Boyd,* 727 S.W.2d 531, 533–534 (Tex.1987), the court defined endanger as "to expose to loss or injury; to jeopardize." *Id.* at 533. The

above constitutes "more than a scintilla" of evidence that Beard engaged in conduct jeopardizing the physical well-being of B.B.

Further, considering all the evidence, the fact finder could reasonably conclude it is highly probable Beard's conduct endangers B.B.'s well-being. The evidence permits a rational trier of fact to hold a firm belief that Beard engaged in conduct which endangers the physical or emotional well-being of B.B. The evidence is therefore factually sufficient. Point of error four is overruled. Having found sufficient evidence for this basis for termination, it is unnecessary to address point of error three as to B.B.

*Termination of Parental Rights to P.B.*

■ Beard's parental rights could not have been terminated on the basis that she knowingly placed or allowed P.B. to remain in dangerous conditions or surroundings since P.B. was placed with CPS before she was a week old and there is no evidence in the record of the conditions or surroundings P.B. was in for those few days. Accordingly, point of error three is sustained as to P.B.

■ It is likewise an unsupportable basis that Beard knowingly placed P.B. with persons who engaged in conduct which endangers her well-being as the record contains no evidence Beard placed P.B. with any person prior to P.B.'s removal from Beard's care. Therefore, regarding point of error four, the only basis upon which termination could be founded is that Beard engaged in conduct which endangers the physical or emotional well-being of P.B.

■ On appeal, Beard argues the physical injury to B.B. could not endanger P.B. as it was not committed in her presence. While this court did hold in *Lane v. Jefferson County Child Welfare Unit,* 564 S.W.2d 130, 132 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.), that the conduct must have been committed in the presence of the child, that holding was overruled, at least impliedly, by the Texas Supreme Court in *Boyd,* 727 S.W.2d at 533–34. In *Boyd,* the court found it was not necessary that the conduct be directed at the child or that the child actually suffered injury. *Id.* The court went on to

hold that if the evidence "shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under section 15.02(1)(E) is supportable." *Id.* at 534.

Further, more recent opinions of other courts of appeals have declined to require the child's presence and have found the conduct engaged in may have occurred prior to the birth of the child. *See Clark v. Clark,* 705 S.W.2d 218, 219 (Tex.App.—Dallas 1985, writ dism'd); *Director of Dallas County Child Protective Serv. Unit of Tx. Dep't of Human Serv. v. Bowling,* 833 S.W.2d 730, 732–33 (Tex.App.—Dallas 1992, no writ); and *Navarrette v. Tx. Dep't of Human Resources,* 669 S.W.2d 849 (Tex.App.—El Paso 1984, no writ). Accordingly, we expressly overrule our holding in *Lane* that the conduct engaged in must be committed in the child's presence and under the guidance of *Boyd* determine if the evidence "shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child." *Boyd,* 727 S.W.2d at 534.

■ As noted above, the record established Beard has a drinking problem and when she drinks she becomes violent. In at least one instance that violence was directed toward her one-year old infant son. The record also established Beard has not sought help for her drinking problem in accordance with CPS' recommendations and even continues to deny she has a problem with alcohol. We find this evidence legally and factually sufficient to support the trial court's finding that Beard has engaged in conduct which endangers the well-being of P.B. It is clearly more than a scintilla of evidence and it permits a rational trier of fact to hold a firm belief as to the truth of the allegation that Beard engaged in conduct which jeopardizes the well-being of P.B. Point of error four is overruled.

*Best Interest*

■ Point of error twelve argues the evidence is legally and factually insufficient to support the trial court's finding that termination was in the childrens' best interest.

An extended number of factors have been considered by the courts in ascertaining the best interest of the child. Included among these are the following: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. This listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent.

*Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976) (footnotes omitted). We will address each of these factors as they relate to the evidence in the record before this court.

A. Nothing reflects the desires of either child.

B. B.B.'s needs, now and in the future, require special care due to fetal alcohol syndrome.

C. Beard's drinking problem and subsequent violent behavior endanger the children's well-being.

D. The parenting abilities of the individuals with whom the children are currently placed are satisfactory.

E. Beard has participated in several programs to assist her in caring for her children but no appreciable change in her behavior was observed. She has not participated in an inpatient alcohol treatment program.

F. The homes in which the children are currently placed both wish to adopt the children.

G. Both foster homes are stable.

H. Beard's continued drinking and failure to enroll in an inpatient treatment program are acts and omissions which may indicate an improper parent-child relationship.

I. Beard's excuse for failure to enroll in inpatient treatment, that it costs too much money, is contradicted and does not explain her failure to seek such treatment until after the hearing for termination was set.

A review of the factors reveals only evidence that indicates termination is in the best interest of both children. There is no evidence that termination of the parent-child relationship is not in the best interest of the children, B.B. and P.B. Point of error twelve is overruled.

### Conservatorship

Point of error thirteen contends the trial court erred in appointing Child Protective Services as the managing conservator of the children because that appointment was not in the children's best interest and was not supported by legally and factually sufficient evidence. Based on our previous discussion, point of error thirteen is overruled.

### ADMISSION OF EVIDENCE

■ In points fifteen and sixteen, Beard contests the admission of certain testimony. We have reviewed the testimony referred to in Beard's brief under these points of error and find no objection. Therefore, no error has been preserved for review. TEX. R. APP. P. 52(a); *see also* TEX. R. CIV. EVID. 103(a)(1). Points of error fifteen and sixteen are overruled.

In her fourteenth point, Beard argues the trial court erred in allowing constant references throughout the pre-trial and trial proceedings to child pornography in the home. Beard's brief admits this complaint is being raised for the first time on appeal. Our review of the record indicates no objection was made to the characterization of the material as pornographic by counsel or the witnesses. Consequently, no error has been preserved for review. TEX. R. APP. P. 52(a); *see also* TEX. R. CIV. EVID. 103(a)(1).

■ Beard argues no objection was required because the language was so inflammatory as to amount to fundamental error.

The authority Beard relies on held the court must, on its own motion, repress *argument of counsel* that is so prejudicial or inflammatory that no instruction would cure the error. *Ramirez v. Acker*, 134 Tex. 647, 138 S.W.2d 1054, 1055 (1940). Later authority has permitted appellate review of alleged incurable jury argument but has not required the trial court to act *sua sponte*. *See Isern v. Watson*, 942 S.W.2d 186, 198 (Tex.App.—Beaumont 1997, no writ). The present case does not involve argument of counsel, but questions by counsel and answers by witnesses which used the term pornography and child pornography to describe the material in the Beard home. We are unable to find any authority, and Beard cites none, applying such cases to questions by counsel or answers by witnesses. Beard's authority is inapposite to the case at bar. Point of error fourteen is overruled.

■ Point of error seventeen claims the trial court erred in admitting CPS' Exhibit No. 17 "because no proper predicate for its admissibility had been made and its admission as an exhibit was in violation of TEX. R. CIV. EVID. 803(5)." Exhibit 17 is a statement made by Lee Beard regarding the incident with Beard and B.B. which resulted in B.B.'s removal from the home. Beard's counsel objected to its admission, but only on the grounds it was not a past recollection recorded. Therefore, that is the only ground available on appellate review. TEX. R. CIV. EVID. 103(a)(1); TEX. R. APP. P. 52(a). TEX. R. CIV. EVID. 803(5) provides:

> A memorandum or record concerning a matter about which a witness once had personal knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly, unless the circumstances of preparation cast doubt on the document's trustworthiness. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Lee could not remember anything about the incident other than Beard pulling B.B.'s hair.

Thus he clearly had insufficient recollection to enable him to testify fully and accurately. Lee Beard made the statement the day after the incident and it was sworn to by a notary public. Lee identified the signature at the bottom of the statement as his. Consequently, the statement was shown to have been made when the matter was fresh in his memory. The record contains no evidence of the circumstances of preparation other than the presence of a notary public. While Beard says the statement was untrustworthy, no explanation is given; Beard does not allege any circumstances which would cast doubt on the document's trustworthiness.

■ Beard further claims the statement was not offered by an adverse party and therefore should not have been received as an exhibit. The record reflects the statement was offered into evidence by the attorney ad litem on cross-examination. While the children are not an adverse party in the typical sense, their interests were not aligned with Beard's—particularly in a termination proceeding. Accordingly, we find the record was offered by an adverse party for the purposes of Rule 803(5).

Lee's statement satisfies Rule 803(5). We find the trial court did not abuse its discretion in admitting the evidence. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995) (the admission or exclusion of evidence is within the sound discretion of the trial court). *See also Fuller–Austin Insulation Co., Inc. v. Bilder*, 960 S.W.2d 914 (Tex.App.—Beaumont 1998, writ requested). Point of error seventeen is overruled.

Point of error eighteen contends the trial court erred in considering the evidence in the pretrial hearings because Beard was without court-appointed counsel at those hearings, in violation of TEX. FAM.CODE ANN. § 107.013 (Vernon 1996). At the termination hearing, CPS tendered into evidence the following items:

- Exhibit No. 11—a certified copy of the deferred adjudication order on Beard for assault;
- Exhibit No. 12—a certified copy of the reporter's record of the hearing conducted on October 12, 1995;

- Exhibit No. 13—a certified copy of the reporter's record of the hearing conducted on December 4, 1995; and

- Exhibit No. 14—a certified copy of the reporter's record of the hearing conducted on April 2, 1996.

The trial court asked, "Any objections?" Beard's counsel responded, "I have no objection, Your Honor." The exhibits were then admitted into evidence.

Error may not be predicated upon a ruling admitting evidence unless a timely objection appears in the record. TEX. R. CIV. EVID. 103(a)(1). Since counsel affirmatively accepted the exhibits, nothing is preserved for review. TEX. R. APP. P. 52(a). Point of error eighteen is overruled.

## INEFFECTIVE ASSISTANCE

Point of error nineteen asserts Beard received ineffective assistance of counsel in violation of TEX. FAM.CODE ANN. § 107.013 (Vernon 1996). While the Sixth Amendment right to effective assistance of counsel is clearly recognized in criminal proceedings, it has not been extended to civil actions. "The courts in Texas have consistently stated that the constitutional right to effective assistance of counsel in criminal actions does not extend to a civil proceeding for termination of parental rights." *In the Interest of J.F.*, 888 S.W.2d 140, 143 (Tex. App.—Tyler 1994, no writ) (citing *Posner v. Dallas County Child Welfare*, 784 S.W.2d 585 (Tex.App.—Eastland 1990, writ denied); *Howell v. Dallas County Child Welfare Unit*, 710 S.W.2d 729, 734–35 (Tex.App.—Dallas 1986, writ ref'd n.r.e.)). Consequently, point of error nineteen is overruled.

The judgment of the trial court is

AFFIRMED.