TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00808-CV






Paige Cox and Tawnya Cox, Appellants



v.



Texas Department of Protective and Regulatory Services, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 99-00653, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING







 Appellants Paige and Tawnya Cox appeal from the district court's decree
terminating their parent-child relationships with S.H.C. and appointing appellee Texas Department
of Protective and Regulatory Services permanent managing conservator. The appellants bring four
points of error contending insufficient evidence supports the decree and the Department abandoned
one of the bases for termination. We will affirm the decree of termination.


Background


 The appellants married in December 1991. Appellants' first child was born in
December 1992, their second child was born in November 1994, their third child was born in
March 1998 and S.H.C., the only child at issue in this proceeding, was born on January 19, 1999.
Appellants had an extensive and turbulent involvement with the Department.(1) Based on this
history, the day after S.H.C. was born, the Department sought to remove her from appellants'
care. The district court granted an ex parte order temporarily placing S.H.C. in the Department's
custody. After several failed attempts to reunite S.H.C. with her parents, the Department filed
a petition alleging four bases for terminating appellants' parent-child relationships with S.H.C.
and that to do so was in the child's best interest. See Tex. Fam. Code Ann. § 161.001(1), (2)
(West Supp. 2000). The Department alleged as bases for termination section 161.001(1)(D), (E),
(M), and (N). Following a non-jury trial, the district court decreed that two bases existed for
terminating appellants' parental rights: (1) that both parents engaged in conduct or knowingly
placed the child with persons who engaged in conduct which endangered the physical or emotional
well-being of the child; and (2) that both parents had constructively abandoned the child who had
been in the temporary managing conservatorship of the Department for not less than six months
and (i) the Department made reasonable efforts to return the child to the parents; (ii) the parents
had not regularly visited or maintained significant contact with the child; and (iii) the parents have
demonstrated an inability to provide the child with a safe environment. See id. at § 161.001(1)(E),
(N). Further, the district court found by clear and convincing evidence that it was in S.H.C.'s
best interest to terminate the parent-child relationships. See id. at § 161.001(2). Finally, the
district court designated the Department S.H.C.'s permanent managing conservator.


Discussion


 A court may terminate a parent-child relationship if it finds by clear and convincing
evidence that a parent has engaged in any of the listed conduct in section 161.001(1) of the Family
Code and that termination is in the best interest of the child. See Tex. Fam. Code Ann.
§ 161.001(1), (2); Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987);
Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976). At trial in a termination case, the
Department is held to a clear and convincing standard of proof, which has been defined as "that
measure or degree of proof which will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established." In re G.M., 596 S.W.2d
846, 847 (Tex. 1980).

 Appellants contend that the evidence is insufficient to support the trial court's
decision to terminate their parental rights to S.H.C. based on section 161.001(E) and (N). 
Appellants do not challenge the district court's finding that termination is in the best interest of
the child. See Tex. Fam. Code Ann. § 161.001(2). In deciding a legal sufficiency challenge in
a parental rights termination case, the appellate court considers only the evidence and inferences
tending to support the findings and disregards all evidence to the contrary. See Leal v. Texas
Dep't of Protective & Regulatory Servs., 03-98-516-CV, slip op. at 9 (Tex. App.--Austin July 27,
2000, no pet. h.) (not yet reported) (citing Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965);
In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951)). If more than a scintilla of probative
evidence supports the findings, they must be upheld. Leal, 03-98-516-CV, slip op. at 9. In
determining a factual sufficiency challenge, we consider a neutral review of all the evidence, both
for and against the findings, and will set aside the judgment only if proof of the facts is so
obviously weak or the findings so contrary to the weight of the evidence as to be clearly wrong
and unjust. See id. (citing Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza, 395 S.W.2d
at 823). We will not substitute our judgment for that of the trier of fact merely because we reach
a different conclusion. See Westech Eng'g., Inc. v. Clearwater Constructors, Inc., 835 S.W.2d
190, 196 (Tex. App.--Austin 1992 , no writ).


Termination Under Section 161.001(1)(E)

 We first address appellants' contention that insufficient evidence supports the
district court's findings that they engaged in conduct that endangered S.H.C.'s emotional or
physical well-being. See Tex. Fam. Code Ann. § 161.001(1)(E).(2) 

 The appellants met in 1990 while attending Texas State Technical College in Waco. 
Mrs. Cox conceded at trial that the couple has a history of violent conflict. The couple received
their first referral to the Department in March 1996 following an allegation that Mr. Cox had
sexually abused their two older children. After an investigation by the Department, this allegation
was ruled out. During the investigation, Mrs. Cox admitted that she had spanked her oldest child
so hard she left a handprint on her leg. The Department received another referral in March 1997
for physical abuse by Mrs. Cox and neglectful supervision by Mr. Cox. The incident occurred
two weeks after their third child was born. Mrs. Cox was readmitted to the hospital due to pain
and, following a standard blood test, the doctor discovered methamphetamines or amphetamines
and marihuana in her system. When the Department's investigator went to appellants' house to
investigate, Mr. Cox appeared as if he was trying to hide their two-year-old son. Eventually
during the visit, the investigator learned that Mrs. Cox had hit her two-year old son and left a
bruise around his left eye. Mrs. Cox admitted that she lost control and spanked her son
excessively. The Department found "reason to believe" the allegations of physical abuse by Mrs.
Cox and negligent supervision by Mr. Cox. Mrs. Cox also told the case workers that in the past
she had been arrested for injury to a child after she struck an eighteen-month-old child she was
babysitting in Maryland. The Department did not immediately remove the Cox children from the
home. Instead, Mrs. Cox signed a Department safety plan promising not to use physical discipline
with the children and acknowledging that failure to comply with the plan could result in the
children being removed from the home.

 In May 1997, in accordance with the Department's safety plan, Mrs. Cox was
psychologically evaluated by Dr. Shinder who testified at the trial. He diagnosed her with manic
depressive disorder. He concluded that she was so personally needy that addressing the needs of
children was almost beyond her scope. He concluded that so many of her views were atypical,
that is they were so far removed from the general mainstream of society, that she would likely
influence children in ways that would be nonproductive to their development and growth. He
concluded that she holds some highly unusual beliefs about being possessed by evil spirits; she
acknowledged having peculiar and strange experiences. She acknowledged unusual sexual
practices. She told Dr. Shinder she believes there is something wrong with her mind. Dr. Shinder
concluded that there was no basis to believe Mrs. Cox would change given her lack of motivation
and cooperation.

 Dr. Shinder also evaluated Mr. Cox in accordance with the Department's plan. 
Although he was scheduled for a session on May 1, after two cancellations and numerous phone
calls, he finally appeared for an evaluation in July. Dr. Shinder noted numerous indications of
emotional disorder disturbances. Dr. Shinder noted that Mr. Cox had been in therapy as an
adolescent and at that time had been prescribed lithium. During the evaluation, Mr. Cox
responded to questions in a rambling manner and avoided eye contact the entire time. Mr. Cox
would jump from one topic to another in a manner that made very little sense. He made it known
repeatedly that he did not want to attend the evaluation. He continually referred to the need to
survive. During the evaluation, there were lots of disruptions and the process took much longer
than usual in all areas. At times, he talked about things obsessively and became progressively
more angry during testing. Mr. Cox acknowledged a history of drug use including alcohol,
marihuana, LSD, amphetamines and cocaine. He indicated the last time he used drugs was about
a week before the session. He did not see his drug use as a problem and it concerned him that the
rest of society does not approve of drug use. At the time, Mr. Cox was a Domino's Pizza delivery
person and the family was supported by Medicaid, food stamps, and his wife's student loans she
received because she was enrolled at the Texas State Technical College. He described himself as
an authoritative parent. Based on his detachment and how he presented himself, Dr. Shinder
concluded that he was probably not an appropriate parent. Dr. Shinder concluded that Mr. Cox
had bipolar mood disorder and was probably a potential candidate for medication but his drug use
was a problem. Dr. Shinder concluded that Mr. Cox's potential for improvement was also greatly
limited because he does not perceive himself as having problems that would warrant assistance.

 In July 1997, the Department opened a family preservation case for appellants and
offered them various social services. The staff assigned to work with appellants quickly became
concerned about the family's lack of cooperation and failure to bring the children to day care as
mandated in the safety plan. In August 1997, appellants signed a second family plan in which they
agreed to drug assessment, individual counseling, family counseling, and to refrain from physical
discipline. Following their agreement to this plan, appellants submitted to one urinalysis.
Although they had several therapy sessions scheduled with Dr. Shinder, they attended only a few.
During the few counseling sessions they attended, Dr. Shinder became more concerned about Mr.
Cox's mental disorders. Mr. Cox mentioned suicidal and homicidal thoughts, messages from God
through the radio, and being introduced by God to a person who made bombs. Dr. Shinder finally
terminated appellants' appointments in January 1998 when they failed to attend. Dr. Shinder
testified that he did not believe a reunification with the children would be possible because there
were so many risk factors which could pose a dangerous situation for the children.

 Some time after appellants agreed to a new plan, they told the Department they
were receiving counseling from Mona Duncan with the Victoria Assembly and that Duncan was
a counselor and therapist. The Department learned, however, that Duncan was neither and
declined to pay for the services she rendered appellants. When the Department contacted Duncan
to see how appellants were progressing, she reported that she had conducted only a few sessions
with appellants. She explained that generally appellants would just stop by her office without an
appointment and would want a session. She described one occasion when Mr. Cox stopped by
without an appointment, told Duncan he wanted a session, and asked Duncan to go and get Mrs.
Cox out of the car and to bring her inside so they could work through a dispute. Duncan informed
Mr. Cox that he must have an appointment and that she would not get anyone out of a car.

 On October 10, 1997, the Department received another referral regarding Mrs.
Cox's physical abuse of the children. The witness saw Mrs. Cox drag her three-year-old son by
the arm out of day care and slam him into a car seat, and she saw scratches from Mrs. Cox's
fingernails on the back of the child's neck. The Department found "reason to believe" that
referral. Another referral received on October 21 was ruled out. While investigating the second
October referral, the case worker arrived at appellants' house and became concerned for the
children's safety when appellants started fighting. Additionally, after October 21, appellants
stopped taking the children to day care, thereby violating their family service plan.

 The Department removed the three children from appellants' home on October 23,
1997. Mr. Cox made it clear that he did not want anyone from the Department speaking with
Mrs. Cox unless he was present. Mrs. Cox did not object to this because she believed that the
Department sought to turn the couple against each other. Mr. Cox strongly resented the
Department removing the children. He told a Department worker he knew why Timothy McVeigh
blew up the federal building. At trial, Mr. Cox admitted that he felt tempted when he met a man
in Beaumont who made bombs, but he had resisted the temptation. In December, the Department
received another referral of sexual abuse of a child by Mr. Cox but they were unable to confirm
the allegation. In December, the Department attempted to enlist appellants' help to develop a new
family service plan. Appellants were asked to sign a new plan that included some additional terms
that included paying $100 per month while the children were out of their home, maintaining
appropriate housing, free from abuse, neglect, and hazards, and attending counseling sessions.
Appellants refused to sign the new plan saying that there was not "any way possible, normal
human being couldn't [sic] do all that they were asking us to do." Mrs. Cox claimed that because
of her college class schedule, she was unable to meet any appointments despite the fact that the
Department set up visitations with the children on days when Mrs. Cox did not have any classes. 
Mr. Cox told the Department that the plan did not fit with the couple's work schedule. Appellants
did not pay the $100 per month and although the new family plan required them to attend
individual counseling, marital counseling, and anger management counseling, they attended only
four or five of the twelve scheduled sessions with an individual counselor. Finally, the counselor
canceled their appointments due to their failure to attend scheduled sessions.

 The Coxes were almost always late visiting their children in foster care. On two
occasions, they failed to show up. When they arrived together, they were either very loving and
affectionate or they would be arguing. When they arrived separately, they would say they were
thinking of divorce. Mr. Cox was very controlling during the visits and would often not allow
Mrs. Cox to speak. Mrs. Cox was very frustrated by his behavior and walked out of one visit.
The visits with the children were chaotic. Often appellants would completely ignore the children. 
During one visit, appellants gave peppermint candy to their one-year-old child. When the
Department worker asked Mr. Cox to take the candy out of the child's mouth, Mr. Cox began
yelling at the worker for intruding. As appellants drove away from that visit, they were fighting
and Mrs. Cox jumped out of the moving car. She later called the Department and told a worker
she felt like committing suicide.

 In April 1998, the Department amended its petition and recommended the
termination of the Coxes' parental rights to their three children. In June 1998, the Department
received another referral regarding Mr. Cox. A parent called police reporting that Mr. Cox
slapped her young daughter after telling her that "you're fixing to get slapped." Mr. Cox claimed
that he accidently backhanded the child while swinging his arms.

 In June or July 1998, appellants were evicted from college housing at the Texas
State Technical College due to unpaid rent and because the campus police had been called to their
home so many times in response to disturbance calls. Appellants lived with friends and then at
the Sandman Motel until September.

 In August 1998, Mrs. Cox notified the Department that she was pregnant. The
Department ordered her to obtain prenatal care. In September 1998, appellants moved from Waco
to Austin. While the record is unclear about where appellants initially stayed in Austin, they
eventually moved to Langston House, a home for displaced people to live until they are able to
find work and homes of their own. The Department sent Maryann Fisher to inform appellants
about services available in Austin. She informed them that they would need to have psychiatric
evaluations and attend anger management classes through Austin Stress Clinic and a Parents
Anonymous course. She also informed them that they would need to submit to urinalysis
screenings every Monday and Thursday and she gave them directions to the location for the
screenings. At the time, appellants told her that they were both working at International House
of Pancakes. Fisher asked them to provide copies of their paystubs to verify the employment. 
Mr. Cox asked for a fax number and told her that he would fax her copies of the paystubs; he
never did. Appellants attended one class offered by Parents Anonymous but did not attend any
anger management classes nor did they schedule the required psychiatric evaluations. Further,
although they were required to submit to urinalysis screenings twice a week they only submitted
to two screenings, one in Waco and one in Austin.

 At trial, Mrs. Cox acknowledged that she had used marihuana, amphetamines, and
cocaine, but she had never had a drug problem because she was not an "every day abuser." She
told the Department's Waco representative that she believed her cocaine use did not impair her
parenting ability and made her an even better parent. She said that the last time she had used
cocaine was six months before trial. This date would have been during her pregnancy with S.H.C. 

 Mr. Cox generally refused to answer questions at trial about his drug use. He only
stated that he had committed many "youthful indiscretions" and made "wrong choices." He "could
not recall" any details concerning when he had used drugs. He did admit that he told a psychiatrist
that he had used marihuana, LSD, amphetamine, and cocaine. Additionally, Mr. Cox testified that
he did not think drug use impaired his ability to parent his children.

 The day after S.H.C. was born, the Department filed an original petition in a suit
affecting the parent-child relationship seeking to take possession of S.H.C. based on her parents'
extensive history with the Department. The district court granted an ex parte order and
temporarily placed S.H.C. in the Department's custody. Mr. Cox was furious and threatened to
"bring down the Department." He called Fisher two days later and in a very hostile and
threatening manner demanded information on S.H.C. He called repeatedly and then left a voice
mail saying: 


There is going to be literally [sic] witch hunt in this country. And I promise you
that he will uphold the righteous and he will uphold me and he will return my
children to me, whether he has to take out all of you or not. Ms. Fisher, I would
be fearing God too right now, very, very seriously, because this kind of crime is
not going to continue in the United States of America.




Mr. Cox also left threatening messages on Fisher's supervisor's voice mail. The supervisor felt
threatened by his phone calls and refused to go to his home, although she offered for him to come
to her office to talk at any time during the day about the situation and the possibility of services
to return S.H.C. to his care. Mr. Cox refused to come to her office. As a result of the
threatening phone calls, the case workers were told to avoid contact with appellants for awhile.
Fisher testified that out of approximately seventy-five cases she had worked on at the Department,
she had never felt threatened by any of the parents of children who had been removed. In this
case, she felt so threatened by Mr. Cox that she obtained and unlisted phone number.

 Although Mr. Cox had been somewhat polite with the Austin office of the
Department, after S.H.C. was removed from appellants' care Fisher testified that "things just went
dramatically downhill." Fisher testified that after Mr. Cox's threatening phone message on
January 22, she received no other calls or communications of any kind from the Coxes.
Conversely, Mrs. Cox testified that she had called to see how S.H.C. was doing but could only
leave a message on Fisher's answering machine and never received a call back.

 On February 1, the Coxes appeared at a hearing and requested a contested case
hearing. Mrs. Cox testified that she asked how S.H.C. was doing but was "brushed off" by Fisher
and the Department. Conversely, Fisher testified that at the hearing she had spoken with
appellants briefly but neither of them asked about S.H.C. Fisher stated that she had very little
conversation with appellants due to the Department's directive to avoid contact with them for
safety reasons. After the hearing, Fisher prepared a new service plan and mailed it to appellants.
Appellants refused to sign the plan. Mrs. Cox testified that they did not attend the required
counseling sessions because they objected that the service providers were not Christian based. The
Department, however, previously informed appellants that they could locate their own Christian
service providers.

 At the end of February 1999, the Department assigned a new case worker to
appellants. Despite mailing several letters and service plans to appellants, the new case worker
never heard anything from them. A court hearing was scheduled for March 8 but the court
rescheduled the hearing for March 22 and appointed counsel for appellants. The court scheduled
a mediation for March which appellants did not attend and so the court rescheduled it for April
8. Appellants attended that meeting but the parties failed to reach an agreement. The parties
agreed to reset the March 22 hearing for April 12. Appellants, however, did not attend the April
12 hearing nor did they attend a status hearing on June 7 or the permanency hearing on August
9. The district court ordered that no services or visitation would be available to appellants until
they presented themselves in court. Appellants also did not attend the Department's permanency
planning team meetings concerning S.H.C.'s placement although they were sent letters inviting
them to the meetings. It became apparent to the Department that appellants did not want to
interact with the Department or accept any services and the Department did not initiate any further
communications with appellants. The supervisor notified appellants' attorney and told him that
if their position changed and they wanted to work with the Department to let her know.

 It is undisputed that appellants chose not to see S.H.C. at all after her birth. At
trial, Mrs. Cox explained her decision:


I have chosen not to see my daughter because if the--even though that she was
seven months old [sic] and she is an infant and she was removed from me at birth
not for her well-being and for mine and my husband as well, I didn't feel that it
was--that it would have been in her best interest to be visiting with her for one hour
a day and then going back and being in someone else's care for an hour a day [sic]
and not only do I feel that it would have killed her physically, emotionally and
spiritually, me at the same time [sic]. 



Mr. Cox explained his lack of contact with S.H.C. by saying he had a spiritual connection with
all of his children and that he had decided not to have any contact with the Department because
he felt they would "misconstrue some more information."

 At the time of trial, appellants were both employed at MCI World
Telecommunications. Mrs. Cox believed they had the financial ability to support S.H.C. She
admitted hitting her son in the past but now believed it was never appropriate to hit a child. She
believed she would benefit from psychological counseling but would prefer to attend Christian
based counseling. At trial, Mr. Cox expanded on his views of discipline, making clear that he
believed spanking his children was acceptable despite his history. He believed he had not done
anything wrong regarding his children except to be honest and open with the Department.

 Christine Haskins, the Department's case worker that worked with appellants while
they lived in Waco, testified at trial that she recommended that appellants' parental rights to their
three older children be terminated. She gave several reasons including an incident that occurred
soon after the children's removal from the home when appellants had been fighting and the campus
police found it necessary to call in the Waco SWAT team for assistance because the police were
fearful for the family's safety. Haskins was also concerned about the appellants' neglect of the
children because one of the children was extremely underweight when he went into foster care and
the children exhibited behaviors that indicated neglect and abuse. The children talked about a
yellow bat that appellants used to hit each other. The oldest child told her foster family that
appellants were very rough with the children and often would throw the baby down on a couch or
in the bed. Additionally, the second child was developmentally delayed and although he was four
years old his speech was difficult to understand. 

 Appellants argue that the evidence presented focused on their lives while they lived
in McLennan County before they moved to Austin in September 1998. They contend that their
previous behavior was indirect in nature and so far removed in time as to not be probative on the
issue of endangerment of their youngest child. 

 When the evidence shows a course of conduct that has the effect of endangering the
physical or emotional well-being of a child, a finding under section 161.001(1)(E) is supportable. 
See Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); Trevino v. Texas
Dep't of Protective & Regulatory Servs., 893 S.W.2d 243, 249 (Tex. App.--Austin 1995, no
writ). "Endanger" means "to expose to loss or injury; to jeopardize." Boyd, 727 S.W.2d at 533.
Although endanger means more than a threat of metaphysical injury or the possible ill effects of
a less-than-ideal family environment, it is not necessary that the conduct be directed at the child
or cause actual physical injury to the child before it constitutes a danger to the child's well-being. 
See In re M.C., 917 S.W.2d 268, 269 (Tex. 1996). Additionally, the conduct engaged in may
have occurred before the birth of the child. See In re B.B., 971 S.W.2d 160, 169 (Tex.
App.--Beaumont 1998, pet. denied). A mother's drug use during pregnancy is conduct which
endangers the physical and emotional well-being of the child. See In re W.A.B., 979 S.W.2d 804,
806 (Tex. App.--Houston [14th Dist.] 1998, pet. denied) (citing Dupree v. Texas Dep't of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.--Dallas 1995, no writ)).

 Appellants argue the fact that they submitted to drug testing that was negative for
any illegal substances in December 1998 and in January and February 1999 showed that they were
clean and their previous drug use should not be considered as it was too far removed in time. 

 At trial, appellants conceded that they engaged in illegal drug use and were not
apologetic about it. They did not feel their drug use impaired their parenting abilities. Over a
period of three years, appellants resisted the Department's requirements that they submit to
urinalysis screenings. In those three years, they submitted to only three drug screenings and those
screenings were on their own terms and not in compliance with the Department's requirement that
they submit to semiweekly drug screenings. Although Mrs. Cox's December 1998 test results
were officially negative, they were borderline for methamphetamine. Additionally, at the
termination trial regarding the other children, Mrs. Cox admitted to using cocaine six months
before S.H.C. was born.

 In addition to the illegal drug use, after the three older children were removed from
appellants' care, the police were called to appellants' house on fourteen occasions to deal with
domestic disturbances. On one occasion, the Waco SWAT team was called because of the concern
about the potential for harm that appellants might cause.

 Over the several years the Department has been involved with appellants, neither
of them exhibited any willingness to take advantage of counseling to help them deal with their
admitted problems of coping with anger. The record reflects that appellants directed harmful
conduct toward their older children so as to support termination of their parental rights and justify
the fear of placing S.H.C. in the same situation. Additionally, after S.H.C. was removed from
appellants' care they both refused to visit her. We think it reasonable, given appellants'
backgrounds, to conclude that their refusal to try to improve themselves as parents or visit S.H.C.
was conduct that endangered S.H.C.'s emotional well-being. Finally, all of the therapists and
Department workers involved expressed grave concerns about returning any of the children to
appellants' care.

 After an extensive review of the record, we hold that the district court had clear and
convincing evidence that is legally and factually sufficient to support the findings that appellants'
course of conduct endangered S.H.C.'s emotional or physical well-being despite the fact that all
of the events occurred outside S.H.C.'s presence. Appellants' contention that the evidence was
insufficient to support the district court's finding that appellants engaged in conduct that
endangered the physical or emotional health of S.H.C. is overruled.

 Because sufficient evidence supports the district court's finding that appellants
engaged in conduct that endangered S.H.C., we decline to address appellants' remaining issues.
The decree terminating appellants' parent-child relationships with S.H.C. is affirmed.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and B. A. Smith

Affirmed

Filed: October 5, 2000

Do Not Publish


1.   In October 1997, appellants' three older children were removed from their care, the
Department was appointed temporary managing conservator, and the children were placed in foster
care. In April 1998, the Department amended its petition and recommended terminating
appellants' parental rights to the three older children. On March 5, 1999, after a jury trial, the
McLennan County district court terminated appellants' parent-child relationships with their three
older children.
2.   Because S.H.C. was removed from appellants' care the day after she was born, the portion
of section 161.001(1)(E) relating to "plac[ing] the child with persons who engaged in conduct that
endangered the physical or emotional well-being of the child" is inapplicable. We, therefore,
focus our review of the record on whether appellants engaged in conduct that endangered the
physical or emotional well-being of S.H.C. 


 Additionally, the conduct engaged in may
have occurred before the birth of the child. See In re B.B., 971 S.W.2d 160, 169 (Tex.
App.--Beaumont 1998, pet. denied). A mother's drug use during pregnancy is conduct which
endangers the physical and emotional well-being of the child. See In re W.A.B., 979 S.W.2d 804,
806 (Tex. App.--Houston [14th Dist.] 1998, pet. denied) (citing Dupree v. Texas Dep't of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.--Dallas 1995, no writ)).

 Appellants argue the fact that they submitted to drug testing that was negative