

NUMBER 13-08-00643-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF H.M.P. AND B.R.P., CHILDREN

**On appeal from the 267th District Court
of Victoria County, Texas.**

# MEMORANDUM OPINION

**Before Justices Yañez, Benavides, and Vela
Memorandum Opinion by Justice Yañez**

Appellant, J.C., appeals the termination of her parental rights to her two children, H.M.P. and B.R.P.[1]  By three issues, J.C. contends:  (1) the evidence is legally and factually insufficient to support the trial court's finding that she committed three statutory grounds for termination; (2) the evidence is factually insufficient to support a finding by clear and convincing evidence that termination of J.C.'s parental rights was in the best

---

[1] To protect the privacy of the minor children, we refer to the parties by their initials. *See* TEX. FAM. CODE ANN. §109.002(d) (Vernon 2008); TEX. R. APP. P. 9.8(b)(2).

interest of the children; and (3) "the trial court erred in its conservatorship determinations." We affirm.

## I. BACKGROUND

On January 24, 2007, J.C. took her two-month-old daughter, B.R.P., to the hospital because J.C found three nails in B.R.P.'s diaper. X-rays of B.R.P. were taken, and the doctor discovered that two nails remained in B.R.P.'s digestive tract. Fortunately, B.R.P. "passed" the nails without suffering any injury.[2] Based on this incident, a referral was made to the Texas Department of Family and Protective Services (TDFPS) alleging physical abuse and neglectful supervision.[3]

On September 19, 2007, TDFPS filed an original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent-child relationship requesting that (1) the children be removed from the parents' home, (2) TDFPS be appointed the temporary sole managing conservator of the children, and (3) if reunification with J.C. was not possible, termination of the parent-child relationship. The children were removed, and the trial court appointed TDFPS as temporary sole managing conservator.

On November 6, 2007, in its temporary order following an adversary hearing, the trial court ordered J.C. to: (1) perform the requirements outlined in TDFPS's original service plan or any amended service plans filed with the trial court during the pendency of the suit; (2) "attend and cooperate fully in counseling sessions at Child-Family-Adult Counseling to address the specific issues that led to the removal of the children from the

---

[2] The nails were one and one-half inches in length.

[3] There is nothing in the record indicating who made the referral.

2

home"; (3) attend and successfully complete parenting classes; (4) "submit urine or saliva samples, at times to be determined by [TDFPS], for analysis by a drug testing laboratory"; and (5) pay child support in the amount of twenty dollars per month. On November 30, 2007, in a status hearing order, the trial court ordered that "the permanency plans and recommendations for the children, set out in the service plans filed with the [trial court], are approved and adopted by the [trial court] as if set out verbatim in this order." The trial court advised the parents, J.C. and M.P., that "progress under the service plan will be reviewed at all subsequent hearings, including a review of whether the parties have acquired or learned any specific skills or knowledge in the service plan."

Under the terms of the service plan, J.C. was required, among other things, to: (1) "attend, participate in, and successfully complete" parenting classes; (2) "attend and cooperate fully in counseling services with [sic] to address the specific issues that led to the removal of her children and to address any additional issues that rise from the psychological evaluation"; (3) "appear at Mid-Coast Family Services and submit to and cooperate fully in the preparation of a drug and alcohol dependency assessment"; (4) "appear at the office of Dr. Michelle Moran and submit to and cooperate fully in the preparation of a psychc [sic]"; (5) pay child support; (6) participate in Battering Intervention & Prevention ("BIP") with Mid-Coast Family Services; and (7) "submit to random drug screenings performed by the caseworker or any other employee of [TDFPS]."

In a permanency plan and permanency progress report filed with the trial court on February 26, 2008, TDFPS documented that although J.C. had not completed all the services in the plan, she was "eager to begin services" and had set up an appointment for parenting classes. It was further noted that J.C. had completed an alcohol and drug

3

assessment, a psychological examination, and one random drug test. However, J.C. had not started parenting classes or individual counseling as ordered by the trial court. On March 7, 2008, in its permanency order, and in its March 7, 2008 permanency hearing order, the trial court found that J.C. had not "demonstrated adequate and appropriate compliance with the service plan." In a permanency plan and progress report filed on July 3, 2008, TDFPS stated that J.C. had completed her drug and alcohol assessment, and recommended that J.C. participate in out-patient treatment, parenting classes, random drug testing, and if she continued testing positive for drugs, inpatient treatment. According to the report, J.C. had submitted two random drug tests; the lab was unable to complete the first test and the second test was negative. On March 21, 2008, when the caseworker asked J.C. to perform a drug test, J.C. refused and admitted that she had used marihuana. Since that date, J.C. had refused to take any more drug tests. J.C. had neither completed nor participated in the BIP program, individual counseling, and parenting classes. On July 11, 2008, in a permanency hearing order, the trial court found that J.C. had "not demonstrated adequate and appropriate compliance with the service plan" and ordered J.C. to pay child support in the amount of $224 per month.

The trial court set the suit for trial on August 26, 2008; a continuance was granted, and a bench trial was held on September 17-18, 2008. After hearing evidence, the trial court ordered the termination of J.C.'s parental rights to H.M.P. and B.R.P., appointed M.P. possessory conservator, and appointed TDFPS permanent managing conservator. The trial court found by clear and convincing evidence that termination of J.C.'s relationship with H.M.P. and B.R.P. was in the children's best interest and that J.C. had violated section 161.001 of the family code by: (1) knowingly placing or knowingly allowing the children to

4

remain in conditions or surroundings which endanger the physical or emotional well-being of the children; (2) failing to support the children in accordance with mother's ability during a period of one year ending within six months of the date of the filing of the petition; and (3) failing to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who were in the permanent or temporary managing conservatorship of TDFPS for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.[4]  J.C. filed a motion for new trial that was overruled by operation of law.  This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

By her first issue, J.C. contends that the evidence is legally and factually insufficient to support the trial court's findings that she violated subsections D, F, and O of section 161.001 of the family code.  By her second issue, J.C. contends that the evidence is factually insufficient "for the trial court to conclude by clear and convincing evidence that termination of [J.C.'s] parental rights was in the best interest of the children."

### A.  Applicable Law and Standard of Review

Before terminating the parent-child relationship, the trial court must find that the parent committed an act prohibited by section 161.001(1) of the Texas Family Code and that termination is in the child's best interest.[5]  Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal

---

[4] *See* TEX. FAM. CODE ANN. § 161.001(D), (F), (O) (Vernon Supp. 2009).

[5] TEX. FAM. CODE ANN. § 161.001; *id.* § 153.002 (Vernon 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.[6] Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence.[7] This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings.[8] It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[9]

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[10] We must assume that the trier of fact, the trial court in this case, resolved disputed facts in favor of its finding, if it was reasonable to do so.[11] We must also consider undisputed evidence, if any, that does not support the finding.[12]

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a

---

[6] *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.–Corpus Christi 2006, no pet.).

[7] *In re J.L.*, 163 S.W.3d at 84; *In re D.S.P.*, 210 S.W.3d at 778.

[8] *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.–Fort Worth 2006 pet. denied); *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 57 (Tex. App.–Corpus Christi 2003, no pet.).

[9] TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

[10] *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

[11] *Id.*

[12] *Id.*

6

provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child."[13]  Under this standard, we consider whether the "disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding.  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."[14]

## B.  The Evidence

Amy Phlaum, a caseworker with TDFPS, testified that she was briefly involved in J.C.'s case when TDFPS removed the children.  Phlaum stated that because the children were able to acquire the nails that B.R.P. swallowed, there was a question of whether there was negligent supervision.  There were also other referrals to TDFPS dealing with domestic violence in the family in another county.[15]  TDFPS was unable to contact the family in that county because the family moved from county to county.[16]  Eventually, TDFPS made contact with J.C., and Phlaum and her supervisor, Gretchen Johnson, met with J.C. on September 18, 2007 at the Victoria TDFPS office.  At the meeting, services

---

[13] *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.–Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d at 28).

[14] *In re J.F.C.*, 96 S.W.3d at 266; *In re M.C.T.*, 250 S.W.3d at 168 (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)).

[15] On cross-examination, Phlaum stated that the domestic violence included an instance where M.P. hit J.C. and other instances where both M.P. and J.C. "exchanged blows."

[16] According to Phlaum, the movement of the family "was a situation where [the family] seemed to be going back and forth.  At some point they were in Graham [County] and [then they] were back in Victoria.  It was hard for the CPS personnel in those locations to be able to keep up with the family and where they were at the time."

were offered to J.C., including, among other things, counseling, parenting classes, and alcohol-drug assessment intervention. By the end of the meeting, it was apparent that J.C. was not interested in the services that were offered.[17] Phlaum stated:

> [I]nitially, [J.C.] expressed being willing to do services, then as the contact progressed, she basically said that she would only do services if it was under a provider or under someone that she wanted to initiate it with. Then ultimately she said that she didn't want to do services at all and that we needed to contact her attorney.

However, J.C. did not provide the name of her attorney. Phlaum testified that J.C. was belligerent, angry, and when TDFPS asked J.C. to perform a drug test, J.C. indicated that the drug test was not necessary because she would test positive for marihuana. J.C. claimed that she had last smoked marihuana two weeks earlier.

TDFPS determined that the children were at risk and they were removed from the parents' custody. On cross-examination, Phlaum stated that TDFPS decided to remove the children because: (1) J.C. refused to comply with the service plan; (2) J.C.'s temper escalated and she became "out of control"; and (3) J.C. was not going to be able to take her psychotropic medication until November 8, 2007, which raised a concern about her mental state.[18] Phlaum testified that a parent's refusal of services alone is not a ground to remove the children and that the decision to remove the children is based on the parents' "track record of everything that led up to that point and [the caseworkers'] concerns, substantial concerns with regard to risk to the children." According to Phlaum, the family was difficult to locate; however, once TDFPS located the family, the children

---

[17] Phlaum testified that if J.C. had complied with the service order on September 2007, the children probably would not have been removed.

[18] We note that J.C. has been diagnosed with bipolar disorder requiring psychiatric treatment.

8

were removed on September 20, 2007.

Sonia Cantu Gonzales, a caseworker with TDFPS, testified that she was assigned to this case on March 5, 2008. According to Gonzales, M.P. had completed most of the requirements of his service plan, except for three more sessions of BIP, and J.C. had completed her psychological examination and her drug and alcohol assessment.[19] However, J.C. had not completed the other requirements of her service plan.

Gonzales testified that although she informed J.C. that under the terms of the trial court's temporary managing conservatorship order, J.C. was required to submit to random drug testing, J.C. continued to refuse to take the drug tests. According to Gonzales, J.C. stated that she would not take the drug tests because she had been using marihuana.[20] On one occasion, Gonzales had a drug test in her hand and asked J.C. to complete it; J.C. "grabbed" the drug test from Gonzales's hand and said, "Give me the f-ing test." Then J.C. yelled profanities and screamed at M.P. When J.C. calmed down, she told Gonzales that she had been "using" and that she did not understand "what was the big deal because she wasn't using in front of her children." Gonzales interpreted J.C.'s comment as meaning that it was okay to use drugs so long as she did not do it in front of the children. J.C. did submit to three random drug tests; however, beginning on March 21, 2007, she refused further testing. On July 11, 2008, at a permanency hearing, the trial court ordered J.C. to undergo a cheek swab test and complete a hair follicle test. Both tests were positive for marihuana, and when Gonzales discussed the results of the test with J.C., she admitted

---

[19] M.P. had never tested positive on a random drug test.

[20] On cross-examination by J.C.'s attorney, Gonzales stated that J.C. had only one negative drug test result.

that she had smoked marihuana.

Gonzales testified that J.C. missed her scheduled visitation with her children "maybe, a few times." J.C. notified Gonzales that she would not be present on one occasion because she did not want to see M.P., and on another occasion, J.C. explained that she did not have a ride. According to Gonzales, J.C. was originally ordered to pay child support in the amount of twenty dollars per month, but she did not pay anything during those months. Then on July 11, 2008, the trial court ordered support in the amount of two hundred twenty four dollars; J.C. paid six hundred five dollars and ninety cents of the total amount due leaving a balance of two hundred ninety two dollars and ten cents.

Gonzales stated that there had been difficulty with J.C. at the visitations, including an incident when J.C. arrived at the visitation site, alone and crying. J.C. told Gonzales that she had been in an argument with M.P. and that he was not going to come to the visitation. J.C. informed Gonzales that she had slapped M.P. in the parking lot and that a man had witnessed the incident. M.P. arrived while J.C. was with the children, and he joined the visit. Gonzales "walked out" briefly and approximately five minutes later, M.P. walked out of the room and J.C. followed saying, "I can't believe you're going to leave. You're leaving. Look, he's leaving." Gonzales told J.C. not to yell in front of the children and that if M.P. wanted to leave, she should let him. When the visitation ended, a man that Gonzales believed worked at "Gulf Bend" came into the office and stated that M.P. and J.C. were arguing outside in the parking lot and that he saw J.C. "hitting [M.P.] in the

10

face."[21] On another occasion, J.C. told the children that when they went home with her, she would take them to the beach. A case worker assistant asked J.C. not to make those types of promises to the children for fear of giving the children "false hope" that they would return home. J.C. "proceeded to get mad—why, why and . . . was kind of yelling again at that time." Gonzales also observed on one visitation that B.M.P. was "digging into J.C.'s purse" and while J.C. talked with H.M.P., J.C. did not notice that B.M.P. had taken out cigarettes from the purse. Finally, Gonzales saw that H.M.P. had a small earring in her mouth, and J.C. was asked to tell H.M.P. to remove the earring from her mouth. J.C. responded, "[W]ell she's not going to swallow it." Based on her observations, Gonzales stated it was her opinion that J.C. does not recognize inappropriate or potentially dangerous situations with the children.

Stacy Marthiljohni, a case supervisor for "Golden Crescent CASA," testified that although she informed J.C. at one of the status hearings that J.C. needed to maintain contact with her, J.C. failed to do so. According to Marthiljohni, J.C.'s location was difficult to determine because she moved "back and forth;" however, J.C. had recently contacted Marthiljohni, and she visited J.C.'s home. Marthiljohni stated that the home was being remodeled and had ample space for the children. At the time, J.C. was living with a man who, according to Marthiljohni, "had a previous CPS case in Harris County."

Marthiljohni stated that she observed J.C. exhibit inappropriate behavior in front of the children, such as confronting staff members, including Marthiljohni, and arguing with

[21] Gonzales stated that she was aware that M.P. had been charged with two counts of assault against J.C. and that he pleaded guilty to one count of assault and was on probation at the time of the termination hearing.

11

M.P. On one occasion, Marthiljohni, who was sitting across the room from J.C., told J.C. that she was an advocate for the children; J.C. responded, "Well, what are you f-ing doing in my face." Marthiljohni stated, "[T]his has been the most belligerent case that I have ever had to be on." On another occasion, Marthiljohni heard J.C. "cussing and yelling up and down the hallway because [M.P.] was leaving." J.C. stated, "Why are you f-ing leaving?" The children were upset and crying when they overheard this.

Marthiljohni testified that it was CASA's recommendation that the trial court terminate J.C.'s parental rights to B.R.P. and H.M.P. and that there should be a "no contact" order because Marthiljohni was "concerned for the children's emotional well-being and health." Marthiljohni explained that termination was in the children's best interest because:

> [J.C.] has been unstable in maintaining her emotions around the children. She's been vulgar to me at a time when the children were present. They were in the same hallway. They were right down the hallway and she was yelling and cussing and that was on August 21[, 2008]. I have concerns with when I'm observing her in the visits sometimes she's not paying attention to both children. I have serious concerns with her ability to parent.
>
> . . . .
>
> I've had several conversations with [J.C.] and talked about the need to comply with services. She has not completed counseling. She's not completed parenting. She's not completed homemaker. There are a lot of things that she hasn't done that are not complicated services and they're at no cost to her. . . . To me that's a concern.
>
> . . . .
>
> [J.C.] has had continued drug use. She did test—well, she admitted to using in March and then she refused to test, refused to test, refused to test, and then boom, in July [2008] when she had to take the test outside of the courtroom, she took the test, threw a fit when she had to take the test and was cussing and was pretty upset outside.

12

She took the test and then she had to take the hair follicle later that day. She did comply with those, but it was only because it was court-ordered.

    . . . .

[J.C. tested] [p]ositive for marijuana. On August 21, [2008] she admitted, after she had cussed me out, she admitted that she had used marijuana three days prior and she admitted in front of [Gonzales] also. This was at the CPS office.

    . . . .

[J.C.] had used marijuana during [H.M.P.'s] birth.

Dr. Moran, psychologist for TDFPS, testified that she received a referral to perform a psychological examination of J.C. The referral indicated that "the initial concern was for the welfare of the child when she was found to have swallowed [some] nails." Dr. Moran stated that she was informed that "it was possible for an infant to swallow the nails due to a sucking reflex and . . . there was some suspicion that maybe [H.M.P.] had picked them up and maybe put them in [B.R.P.'s] mouth in an attempt to feed her."[22] In her psychological evaluation, Dr. Moran documented that the referral from TDFPS indicated that H.M.P. "had been found holding nails in her hand, and there were nails in her room as well." Dr. Moran considered the incident an "extremely dangerous" situation for B.R.P.

During the psychological examination, J.C. indicated that she was undergoing psychiatric treatment and taking prescription medication because she had been diagnosed with bipolar disorder and post-traumatic stress disorder. J.C. admitted to Dr. Moran that there were periods of time when "she did not follow the doctor's orders and did not reliably take her medication." J.C. told Dr. Moran that her parents had abused drugs and that

---

[22] H.M.P. was two at the time of the incident.

when she moved to her grandparents' home, "she had difficulty adjusting to the positive environment." J.C. stated that she began using marihuana and other drugs when she was a teenager and had "significant behavior problems at school and at home." J.C.'s behavioral problems when she was a student included: (1) noncompliance with authority; (2) difficulty maintaining self-control when angry; and (3) angry outbursts.[23] J.C.'s grandparents sought psychiatric treatment for J.C. At the age of sixteen, J.C. left her grandparents home and moved in with a boyfriend.

Dr. Moran opined that J.C. is in need of ongoing psychiatric treatment and that although J.C. had received some treatment, "she really did not have . . . total symptom control." Dr. Moran believed that J.C. has "a tendency to have manic thought processes" and "some difficulties focusing her train of thought at that time." It was Dr. Moran's opinion that J.C. needed domestic violence classes, "parent training[,] and counseling" because J.C. needed to better understand her errors in judgment, such as her dysfunctional relationships and unstable living arrangements. J.C. also needed to establish employment. According to Dr. Moran, J.C., although "well-intentioned[,] had not yet achieved stability, more than a year, a year and a half nearly after [TDFPS] initially became involved and that was of concern to [Dr. Moran] given that [J.C.] was well aware that her children's custody depend[ed] upon her stabilizing her life in each of these areas . . . sobriety, psychiatric stability, stable relationships, stable home, et cetera." Due to J.C.'s unwillingness to make and maintain the necessary changes over a significant period of time, Dr. Moran was not "willing" to risk giving J.C. sole custody of the children; therefore, Dr. Moran recommended

---

[23] According to Dr. Moran, J.C.'s current behavior is similar to her behavior as a student.

14

that joint custody be given to J.C. and M.P.

J.C. acknowledged to Dr. Moran that she had used marihuana, but claimed that she had been sober since October 2007 and assured Dr. Moran that she would continue to maintain sobriety. J.C. was "aware that any recidivism into drug use would be considered an egregious form of instability and could result in termination of her parental rights" and that substance abuse caused a risk to her children. Dr. Moran stated that if someone with J.C.'s background and symptoms had lied about "sobriety from the use of marihuana," there would be "a dangerous risk to young children placed in [her] care." Dr. Moran elaborated, "[I]n particular with the psychiatric problems that [J.C.] has—use of any kind of illegal drugs or alcohol in combination with the psychotropic [medication] is inadvisable. It could present a risk to [J.C.'s] safety as well." When the children's attorney ad litem asked Dr. Moran if her recommendation would be affected if she knew that J.C. had tested positive for drugs on multiple occasions, Dr. Moran stated,

> Yes. It really would because [J.C.] acknowledged to me that part of the reason she believes she did not achieve system control as a teenager, even though her grandparents had her undergoing psychiatric treatment, was that she continued to use illegal drugs while taking or not regularly taking her medications. I had very much hoped that that knowledge would lead to a change in her adult behavior and help her recognize that this psychiatric disorder is extremely serious and needs to be managed in a very structured [manner], fashioned under medical opinion[,] and if I find that she has not been doing that and has been interfering with her brain chemistry through illegal drugs, which she herself posed a problem before, it raises very serious concern about any change that she states she had made.

Dr. Moran opined that J.C. would require psychiatric treatment throughout her lifetime to ensure that she lives "a stable and drug-free lifestyle."

Delores Tucker, who provides "parenting-homemaking services," testified that J.C. and M.P. had attended individual parenting sessions with her that included lessons in basic

15

child development, behavior management, how to "follow-up" with the TDFPS service plan, and activities for parents and children. According to Tucker, J.C. and M.P. attended one session in February together, but thereafter, each parent attended individual sessions.[24] J.C. did not receive a certificate of completion and attended only five sessions where Tucker focused on helping J.C. "follow-through" on the service plan. Tucker stated, "I really had more concern with [J.C. following through on the service plan] versus how she was going to manage . . . the kids." During this period of time, Tucker was aware that J.C. was refusing to take the drug tests required by the service plan. Tucker identified plaintiff's exhibit 3 as M.P.'s certificate of completion of parenting class after thirteen sessions.

Tammy Harger, the BIP program coordinator for "Mid Coast Family Services," testified that M.P. has attended twenty-one BIP sessions and at the time of the hearing, needed three more sessions; J.C. stopped attending the class on July 22, 2008 after attending ten sessions. By that time, J.C. had been offered eighteen sessions and had been "discontinued" from the class due to lack of attendance. J.C. had only paid forty dollars for two sessions; however, Tucker explained that she would not have excluded J.C. from attending classes even if she did not make the required payments.[25]

Amy Faust, a licensed professional counselor, testified that she counseled both J.C. and M.P. The sessions were once a week with each parent individually. M.P. has attended all of his scheduled sessions except for one, when he had to leave town.[26]

---

[24] It appears from the record that J.C. and M.P. began individual counseling after they separated.

[25] Each session costs twenty dollars.

[26] M.P. had been attending counseling with Faust on a weekly basis since March 11, 2008 until the date of the termination hearing on September 17, 2008. The last session with M.P. was on September 17.

16

According to Faust, J.C. has attended three sessions; J.C. "no-showed for a session, meaning she missed a session without calling to cancel" and after missing a few more sessions, J.C. stopped contacting Faust.

Based on her contact with J.C. and the reference materials supplied by TDFPS, Faust believed that J.C. needed "[s]ome parenting [classes], some substance abuse counseling perhaps, some relationship issues [counseling]." Faust stated that she had worked with M.P. on parenting skills, communication skills, relationship skills and stress and anxiety issues. Based on her experience with M.P., Faust believed that he had a grasp of the issues and was making progress on those issues. According to Faust, "[M.P.] learned some new things [regarding parenting]. . . . [H]e looks at the concept of parenting from a little bit different perspective. . . . [T]he idea of protecting his children . . . has changed a little bit. He's starting to see that they [the children] don't need just physical protection, but that they need emotional and mental protection as well." Faust stated that the children would be joining the counseling sessions with M.P. if he continued to progress.

M.P., as a witness for TDFPS, testified that he pleaded guilty to assaulting J.C.; however, he claimed that he did not cause her physical injury. According to M.P., he had been "abused" by J.C. on numerous occasions and that during the "fights," he defended himself from her. M.P. understood, after completing BIP, that a man should not hit a woman.

According to M.P., J.C smoked marihuana and there were instances where he smelled the faint scent of the drug in the bathroom. M.P. claimed that he observed J.C. under the influence of marihuana when he arrived home from work. M.P. stated, "I would come home and smell [marihuana] and it would start an argument. There's even been a

17

time when I came home a little earlier. She was on the porch, had her joint in her hand. At that time I took it from her hand, ripped it up and threw it on the ground and called the cops." M.P. stated that he called the police because he did not want drugs around his children. M.P. testified that he was aware that J.C. smoked marihuana when she was alone with the children and that on those occasions, J.C. appeared "real relaxed." However, M.P. did not want to state that the children were ever harmed by J.C.'s use of marihuana.

M.P. recalled that the family was at a restaurant, and H.M.P. was refusing to walk back to the table from the restroom. H.M.P. sat on the floor, and J.C. pulled H.M.P. by the hair back to her seat. H.M.P. sat at the table and cried; H.M.P. was not allowed to leave the table again. According to M.P., J.C. would sleep a lot during the day, and when he would go home for lunch, the children would be awake, while J.C. slept on the couch. M.P. also claimed that J.C. would yell "very loudly" at the children.

J.C. testified that she has bipolar disorder and takes two hundred milligrams of "Lamictal." J.C. stated, the medication is "supposed to help me slow down my manic part. To help me—it wasn't supposed to rid the manic part because you just can't rid it. It was just supposed to level me."

J.C. explained that she "had no reason" for not completing the parenting classes but that she did not have a phone and it was difficult for her to contact Tucker because she had to borrow her neighbor's phone. J.C. indicated that she was supposed to complete the BIP classes but that she stopped attending because she "lost her transportation" when M.P. moved out of the home. J.C. claimed that although she asked Gonzales to "get out of [her] face" in a "rude tone," she never used profane language.

18

J.C. admitted that she has tested positive for marihuana, but claimed that she was sober when her children were born. J.C. explained that during her pregnancy, when she lived in Jewett, "CPS" was monitoring her and testing her for drugs. J.C. tested positive for marihuana when H.M.P. was born, but according to J.C., H.M.P. did not test positive for the drug.[27] J.C. stated that she was sober during her entire pregnancy with B.R.P.

According to J.C., she began smoking marihuana again due to depression, but that she never smoked the drug "in front" of her children. J.C. stated that the smell of marihuana in the house was caused by her smoking it on the front porch of the home. She stated, "I would have a gate, a baby gate, and our couches were stationed—because we had an old house—on the sides so the only thing they would get in—the room was closed—was in the living room. They couldn't get through our house. I would sit outside and I would take a couple of tokes from a joint and then I would come inside my—usually [B.R.P.] was either having toys on the carpet playing around. I mean, I did bad for smoking it while they were there, but I never smoked it in front of them."[28]

On cross-examination, J.C. clarified that the smell of marihuana drifted into the house because she left the door open with the child's gate attached. J.C. stated that

---

[27] Dr. Moran noted in the psychological evaluation that H.M.P. "was born testing positive for marijuana."

[28] Dr. Moran noted in J.C.'s psychological examination that J.C.

> was observed to have a very short attention span, with distractibility, an elevated activity level, with constant fidgeting, impulsive responding, and driven motor movements. Her speech was rapid and pressured. . . . [J.C.'s] thoughts were not consistently goal-directed, and she introduced a number of irrelevant or tangetially-related details that contributed to run-on speech that required frequent redirection to the topic at hand, and her clinical presentation, even when seen on medication, bore substantial symptoms of mania.

We note that at the termination hearing, J.C.'s responses to questions lacked coherence and there are many details of her answers that we are unable to decipher.

during the past year that TDFPS had been involved in the case, she had refused to take three drug tests and had informed TDFPS that two of the tests were unnecessary because she would test positive for marihuana. J.C. claimed that although she refused to take the drug tests required by TDFPS, she went to the health department and took drug tests that were negative; however, J.C. did not bring documentation of the negative results to court. J.C. acknowledged that the trial court ordered her to take a cheek swab and hair follicle drug test and that she tested positive for marihuana. When asked by the children's guardian ad litem if she understood that she was not supposed to use any drugs to get her children back, J.C. responded, "Yes."

J.C. agreed that marihuana use alters her state of mind; however, when asked if an altered state of mind could affect her care of the children, J.C. responded:

Some people it's different. Not everybody is the same smoking. It's bad either way you look at it, yes, but some people it affects them differently.

. . . .

Some people it relaxes them. Some people, you know, there's different, you know, there's different things that marijuana can do, you know, because it's a chemical getting into your brain and people has [sic] different chemicals in their brain, therefore, it can affect somebody way worse than it could affect somebody—just mellow. I mean, there's different ways it could affect a person's ability or anything.

. . . .

When I meant mellow, I don't mean in a comastoke, [sic] you know, in a trance. I don't mean in a como, [sic] like, you know, like in a state where you're just like duh. I meant like relaxed as if, okay, you hear kids screaming or they want a toy or they're hungry or nothing. It would make me not so jumpy, or not so, you know, I would do what I got to do—I clean, you know, everything. I was quiet with my kids. I played with my kids. I mean it wasn't right that I was on the drug, but I wasn't pulling out my hair, screaming, yelling, hitting, nothing like that; nothing like that, but . . . I was under the influence.

20

J.C. further stated, "[I]t wasn't that I smoked a whole joint. I took a couple of hits and it was—I was a little bit impaired, but it wasn't to the point where I am sitting on the floor and my kids are running around with a dirty diaper or anything." When asked if she was concerned that the children may have been inhaling second hand smoke from her "joint," J.C. responded:

> They weren't because—no, they weren't because the gate was there and where I smoked, our house, the front door was right here, like the front door was right here and our porch was, I'm going to say the length of this room and I would be on the corner where there's trees and bushes and it would go, I mean there. I mean it was, everything was just closed.
>
> I had a house in front of me. I had a house beside me. It was me and I would sit there. My kids couldn't, I mean my kids was [sic] at the thing and I could pop my head in and I could see them, but it was never where I'm sitting like five feet. It was always at least, I'd there be [sic] and the gate would be like, I mean the door would be right here.

J.C. admitted that she would sometimes interact with her children immediately after using marihuana.

J.C. acknowledged that she was ordered to pay child support in the amount of twenty dollars per month and that she did not pay "much" of that amount because she was "giving it to her sister, Carrie," who had been given possession of the children. J.C. stated, "I should have read my papers correctly—and it did state because showing, you are showing me a piece of paper that we have to send it to the [TDFPS], I mean the Attorney General. . . ." After the amount of child support was increased to $224 per month, J.C. made a payment of approximately $650.

## C. Section 161.001(1)(O)

In order for a court to terminate parental rights under section 161.001(1)(O), the

21

court must find by clear and convincing evidence that the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child."[29]

J.C. does not dispute that at the time of trial, the children had been in the temporary managing conservatorship of TDFPS for not less than nine months as a result of the children's removal under Chapter 262 for abuse or neglect. J.C. also concedes that testimony "indicated that a court order was in place" and that she "violated a court order by refusing a drug test." However, J.C. argues that based on this evidence, "it is impossible to determine if [she] failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children" because there is "no evidence relating to specific court orders." We disagree.

Although TDFPS did not offer the trial court's orders into evidence, it asked the trial court to take judicial notice of the trial court's own file in the cause.[30] A trial court may take judicial notice of its own orders, records, and judgments rendered in cases involving the

---

[29] TEX. FAM. CODE ANN. § 161.001(1)(O).

[30] *See* TEX. R. EVID. 201(b) (providing that judicial notice may be taken upon request at any stage of the proceedings of any adjudicative fact which "is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

same subject matter and between practically the same parties.[31]

J.C. did not object to TDFPS's request for the trial court to take judicial notice of its file, which contained several of its orders involving the same subject matter and the same parties. TDFPS acknowledges that the record does not reflect that the trial court ruled it would take judicial notice of its file; however, a trial court need not announce that it is taking judicial notice.[32] Moreover, [j]udicial notice is mandatory when a party requests the court do so and the party supplies the court 'with the necessary information.'"[33] In this case, the trial court had the necessary information, its own file, and TDFPS requested for the trial court to take judicial notice of that file; therefore, judicial notice of the court's file was mandatory.[34] Thus, the trial court's orders requiring J.C. to comply with the service plan, attend parenting classes, pay child support, and submit to random drug tests were properly before the trial court. In its temporary order following the adversary hearing, the trial court notified J.C. and M.P. that they were required to complete the actions ordered by the trial court to "obtain the return of the children" and that "failure to fully comply with [the] orders may result in the restriction or termination of [their] parental rights." At the termination hearing, J.C. admitted that she had not complied with the service plan, attended parenting

---

[31] *In re Shell E&P, Inc.*, 179 S.W.3d 125, 130 (Tex. App–San Antonio 2005, orig. proceeding) ("The trial judge was entitled to take judicial notice of his own prior order entered in a related case between substantially the same parties.") (citing *Gardner v. Martin*, 162 Tex. 156, 345 S.W.2d 274, 276 (Tex. 1961)); *Sierad v. Barnett*, 164 S.W.3d 471, 481 (Tex. App.–Dallas 2005, no pet.); *Brown v. Brown*, 145 S.W.3d 745, 750 (Tex. App.–Dallas 2004, pet. denied); *Bryan v. Blue*, 724 S.W.2d 400, 402 (Tex. App.–Waco 1986, no writ); *Escamilla v. Estate of Escamilla*, 921 S.W.2d 723, 726 (Tex. App.–Corpus Christi 1996, writ denied).

[32] *Sierad*, 164 S.W.3d at 481. We note that during redirect examination of Gonzales, the attorney for TDFPS stated that the trial court had taken judicial notice of its file, and J.C. did not object.

[33] *Brown*, 145 S.W.3d at 750 (citing TEX. R. EVID. 201(d)).

[34] *See id.*

23

classes, or submitted to random drug tests. Furthermore, the trial court could have reasonably believed Gonzales's testimony that J.C. failed to comply with the trial court's orders requiring J.C. to submit to random drug tests and pay child support.[35]

After viewing the evidence in the light most favorable to the finding, we conclude that there was legally sufficient evidence for a reasonable trier of fact to form a firm belief or conviction that J.C. failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children.[36] Furthermore, after examining the entire record, we conclude that the evidence was factually sufficient to support the trial court's finding that J.C. violated section 161.001(1)(O). We overrule J.C.'s first issue.

## D. Best Interest

By her second issue, J.C. contends that the evidence is factually insufficient to show by clear and convincing evidence that termination of J.C.'s parental rights was in the best interest of H.M.P. and B.R.P. J.C. argues that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding based on the following: (1) "this is not a case where [J.C.] intentionally abused her children or treated them horribly"; (2) it is undisputed that J.C. loves her children and did not knowingly cause them harm; (3) a review of all of the evidence "suggested that the physical and emotional needs of the children were being met before they were removed"; (4) there was no physical or emotional abuse; (5) the "nail incident" was a "random accident precipitated by [M.P.'s] carelessness

---

[35] *In the Interest of T.N.*, 180 S.W.3d 376, 382-83 (Tex. App.–Amarillo 2005, no pet.) (providing that the trier of fact "may freely choose to believe all, part, or none of the testimony espoused by any particular witness").

[36] *See In re J.L.*, 163 S.W.3d at 85.

in leaving nails accessible to the children"; (6) J.C. provided for B.R.P.'s medical care; (7) J.C. "attempted to protect her children by leaving [M.P.] when he became abusive"; (8) there was a general consensus among the caseworkers and family that J.C. interacted well with [the children] and they loved her"; (9) J.C. missed "very few" visitations with the children and she acted appropriately; (10) J.C. has committed to changing and improving her life; (11) the abusive relationship with M.P. has ended and the children "will no longer be subject to the arguments between" J.C. and M.P.; (12) J.C. has acknowledged her mistakes; (13) J.C. has raised the children since their birth; (14) the evidence does not show that J.C. "has caused the children any physical, emotional or developmental problems"; (15) J.C. provided for the children's physical and emotional needs; (16) "several witnesses testified that [J.C.] had the ability to manage and interact well with the children"; (17) although J.C. did not complete parenting classes, Tucker stated that J.C. "grasped the parenting skills and was good at managing the kids"; (18) although J.C. did not comply with the service plan, "she did try"; (20) J.C.'s "plans for the children and the stability of the proposed placement weigh in favor of reversing complete termination; (21) J.C. "tried to show at the hearing that she was no longer using marijuana"; (22) Dr. Moran recommended joint custody; and (23) J.C. has made an effort to improve her life.

When considering whether parental termination is in the child's best interest, the following non-exhaustive list of factors should be considered: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or

proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent.[37] The party seeking parental termination is not required to prove all nine factors.[38] Furthermore, when the department or another government agency is the petitioner, subsection 263.307(a) of the Family Code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."[39] Subsection (b) then lists thirteen factors that the court, the department, or other authorized agencies should consider in determining whether a parent is "willing and able to provide the child with a safe environment."[40] In our review of

---

[37] *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

[38] *See In re C.H.*, 89 S.W.3d at 27 (providing that these considerations are not exhaustive, "or that *all* such considerations must be proved as a condition precedent to parental termination") (emphasis in original); *In re J.R.S.*, 232 S.W.3d 278, 284 (Tex. App–Fort Worth 2007, no pet.) ("These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.").

[39] TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2008).

[40] *Id.* § 263.307(b). Those factors enumerated in section 263.307(b) include, among others, the following:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

. . . .

(6) the results of psychiatric, psychological, or developmental evaluations of the child, parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

. . . .

the trial court's termination order, we will likewise give consideration to these factors to the extent applicable.[41]

## 1. Desires of the children

Both children were under the age of five at the time this case was tried. However, the record reflects that the children's behavior was better when J.C. and M.P were not with the children, and that after completing parenting classes and attending counseling sessions, M.P. had a better understanding of how to redirect the children's behavior, especially, H.M.P., who by all accounts, was a very active toddler. Furthermore, there was evidence that J.C. was not capable of redirecting H.M.P.'s behavior and in some instances, instigated H.M.P.'s inappropriate behavior.[42] Marthiljohni testified that she observed H.M.P. spitting in J.C.'s face at one of the visitations and that although there was not a "fight," J.C. and H.M.P "would fight back and forth between each other."

## 2. Present and future physical and emotional needs of the children

---

(10) the willingness and ability of the child's family to seek out and accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time. . . .

*Id.*

[41] *See In the Interest of R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In the Interest of S.N.*, 272 S.W.3d 45, 50-51 (Tex. App.–Waco 2008, no pet.); *In re T.N.F.*, 205 S.W.3d 625, 632-33 n.3 (Tex. App.–Waco 2006, pet. denied).

[42] In addition to the instances described above, Gonzales testified that after J.C. visited with the children and M.P. began his visit with the children, the children had been crying for "awhile." After the children "settled down," as J.C. walked out of the building, J.C. "put her face to the wall [of the room where the children were visiting with M.P.] and screamed, "bye [H.M.P.]" Marthiljohni testified that when J.C. encountered M.P. while visiting the children separately, J.C. would make inappropriate, "ugly" comments in front of the children to M.P. as he walked by her. Marthiljohni also stated that in the last visit she observed, J.C. acted "very juvenile" in her interaction with H.M.P. and it appeared as if J.C. was attempting to upset or set H.M.P. off. This interaction disturbed Marthiljohni. According to Marthiljohni, after J.C. took some earrings away from H.M.P., H.M.P. began crying and hitting J.C., and J.C. was unable to redirect H.M.P.

27

J.C. suffers from bipolar disorder and has admitted that she does not always take her medication or follow the recommendations of the doctors concerning her condition. Furthermore, although Dr. Moran testified that it is dangerous for a person with J.C.'s medical needs to use marihuana, J.C. continues to insist that she uses it to "relax." It appears from the record that J.C. does not appreciate the danger of using a mind-altering drug while caring for her children, especially in light of her medical condition.

Marthiljohni testified that J.C. "has been unstable in maintaining her emotions around the children" and has been "vulgar" and acted inappropriately by yelling and screaming in front of the children. B.R.P. swallowed five nails while in J.C.'s care. Marthiljohni stated that her understanding of the event was that H.M.P. acquired the nails while in J.C.'s care, and believed that both J.C. and M.P. were responsible for the incident, because M.P. left the nails in a bowl on the table and J.C. was at home with the children when it happened. Marthiljohni understood that M.P. was at work when B.R.P. actually swallowed the nails. Dr. Moran stated that H.M.P. was discovered holding nails in her hand, and J.C. testified that she found the nails in B.R.P.'s diaper. According to J.C., she would smoke marihuana while caring for her children. Gonzales stated that J.C. did not notice when B.R.P., who was standing right next to J.C., took cigarettes out of J.C.'s purse. From this evidence, the trial court could have reasonably inferred that J.C. was not properly supervising the children when H.M.P. fed the nails to B.R.P. Marthiljohni stated that CASA recommended that J.C.'s parental rights be terminated because she is concerned for the emotional well-being and health of the children.

Phlaum testified that there had been referrals made regarding J.C. and M.P. in other counties in Texas and that TDFPS had unsuccessfully attempted to make contact with J.C.

28

and M.P. regarding those referrals because the family was "moving about." J.C. testified that TDFPS had investigated her parenting ability because J.C. had tested positive for marihuana when she was pregnant with H.M.P., and there is evidence in the record that H.M.P. suffered from a lung condition when she was born and had also tested positive for marihuana.[43]

### 3. Present and future emotional and physical danger to the child

J.C. had a history of placing herself in environments where the children observed physical abuse. According to M.P., when the children were in J.C.'s home, J.C. physically abused him and he physically abused J.C. Furthermore, before visiting the children, J.C. attacked M.P. in the parking lot. At the time of trial, J.C. lived with a man who had a history with CPS; J.C. was not aware of why this man had been referred to CPS or whether he had been cleared of any allegations.

J.C. engaged in illegal drug use even after being informed that she would not be reunited with the children. J.C. testified that although she smoked marihuana, she never did so in front of the children; however, she also stated that she was not negatively affected by the drug because it only "relaxed" her and did not put her in a "trance." J.C. believed that she was capable of supervising the children despite the fact that she had been smoking marihuana. J.C.'s continued drug use and inability to recognize its dangers

---

[43] *See Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.–Dallas 1995, no writ) ("The use of drugs during pregnancy may be conduct which endangers the physical and emotional well-being of the child.") (citing *In re Guillory*, 618 S.W.2d 948, 951 (Tex. Civ. App.–Houston [1st Dist.] 1981, no writ)).

weigh strongly in support of finding that termination was in the children's best interest.[44]

A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children.[45] M.P. stated that he called the police when he smelled marihuana in their home, and it is reasonable to infer that he would continue to contact authorities if J.C. continued using drugs. Moreover, conduct that subjects a child to a life of uncertainty and instability because of the probability that its parent or parents will be jailed because of illegal conduct thereby leaving the child alone, endangers the child's physical or emotional well-being.[46]

### 4. Parental abilities of the person(s) seeking custody

The evidence shows that J.C. is unable to provide a safe and stable home for the children. There was evidence that J.C. is not employed, and she is unable to provide housing for her children without her new boyfriend's assistance. The boyfriend works a full-time job; however, according to J.C., they could not afford housing in Victoria, which J.C. claimed caused her inability to complete her service plan, attend parenting classes and seek counseling. According to the evidence presented, J.C. constantly moved from county to county with the children. J.C. was unable to supply TDFPS with a stable address during

---

[44] *See Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.–Houston [1st Dist.] 2006, no pet.) ("Evidence of narcotics use and its effect on a parent's life and her ability to parent may establish that the parent has engaged in an 'endangering course of conduct.'"); *see also Latham v. Dep't of Family & Protective Servs.*, 177 S.W.3d 341, 348 (Tex. App.–Houston [1st Dist.] 2005, no pet.) (concluding that evidence of drug use by the parent coupled with continuing use even though the parent was aware that her parental rights were in jeopardy may establish an endangering course of conduct).

[45] *In the Interest of T.N.*, 180 S.W.3d at 383 (citing *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686-87 (Tex. App.–Houston [1st Dist.] 2002, no pet.)).

[46] *Id.*

the pendency of the proceedings, and although there is evidence that there is ample room for the children at J.C.'s current residence, she was living at her boyfriend's home. Without employment, J.C. is not able to afford her own home. Marthiljohni testified that she has "serious concerns with [J.C.'s] ability to parent" the children, and Gonzales stated that she believed that J.C. does not recognize inappropriate or dangerous situations regarding her children.

H.M.P., a three-year-old child, has exhibited tantrums, and J.C. has not been able to provide adequate redirection. The evidence shows that H.M.P. did not exhibit the inappropriate behavior when J.C. and M.P. were absent. H.M.P. and B.R.P. have witnessed J.C.'s physical and verbal altercations with M.P. and others. M.P. testified that J.C. pulled H.M.P. across the floor by her hair when she was not able to deal with H.M.P.'s behavior at a restaurant.

J.C. does not recognize the danger posed by smoking marihuana while caring for two young children. Dr. Moran testified that had J.C. told her she was still using marihuana; Dr. Moran would not have recommended reunification with the children.

### 5. Available assistance programs

J.C. has not completed any of the available assistance programs. At her first meeting with caseworkers, J.C. indicated that she was not willing to comply with the service plan, and in fact, did not comply with most of its requirements. Further, she failed to keep her counseling appointments, indicating a lack of willingness to participate in the available assistance. J.C. also refused to attend outpatient drug treatment as recommended. Tucker testified that if the parent does not contact her, appointments for parenting classes are not scheduled, but that J.C. had only scheduled five appointments with her from March

31

1, 2008 through August 1, 2008.  According to Tucker, J.C. had "somewhat" grasped the requirements presented in the parenting classes she attended, but when Tucker did visit with J.C., the focus of the meeting was not on parenting skills but on assisting J.C. with "follow[ing] through" with her service plan.

J.C.'s counselor, Faust, testified that she met with J.C. on three occasions, but that J.C. then failed to attend several scheduled appointments and was eventually dropped as a client.  In plaintiff's exhibit 4, Faust's counseling progress reports regarding J.C. and M.P., Faust documented that J.C. had not "yet accepted responsibility for her contribution to the events that resulted in the removal of her children, and seems to blame [M.P.] for the mistakes that brought the two of them to counseling."  Faust also stated that J.C.'s missed appointments "present[ed] a concern in regards to her commitment to treatment, and that J.C.'s "lack of accountability adds concerns regarding and [sic] inability to succeed in treatment."  According to Faust's assessment, J.C. did not "appear committed to treatment," and in the only session attended in the month of May 2008, J.C. "denied both having run out of medicine that is meant to treat bipolar symptoms, and that she continues to use marijuana."  Faust noted that J.C. "appeared untruthful and guarded and conveyed an air of manipulation" and that J.C. did "not speak to her children [or] indicate any discomfort in being separated from them."  The report indicates that J.C. showed "no earnest interest in additional feedback or information."

Faust noted that she was concerned for the safety of the children "as [J.C.] express[ed] no concern for their well-being and indicat[ed] no discomfort regarding the lack of time she spends with them."  In a progress report dated August 14, 2008, Faust recommended "reunification with [M.P.] and the children" and "that the children have

32

limited, if any, contact with [J.C.] based on reported lack of responsibility on [J.C.'s] part." Faust documented that "[r]eported behaviors by [J.C.] at the CPS office present[ed] a great concern regarding the safety and well-being of the children should they continue to be in the presence of [J.C.]."

6. Plans for the children by those individuals or by the agency seeking custody

TDFPS has been appointed permanent managing conservator of the children and M.P. has been appointed possessory conservator. The evidence shows that M.P. is in compliance with the terms of his service plan, and has completed parenting classes and counseling.

J.C. has not followed through with court-ordered counseling or with outpatient drug treatment. J.C. stated that she did not have a reason for not attending parenting classes, except that she did not have a phone. From the first meeting with TDFPS, J.C. indicated that she was unwilling to cooperate with caseworkers or complete the requirements of her service plan. M.P. has complied with the requirements of the service plan, has completed parenting classes, and is continuing to complete the rest of the requirements necessary for reunification with his children.

Based on all of the evidence presented, and applying the best-interest factors, we conclude that the trial court could reasonably have formed a firm conviction or belief that termination of J.C.'s parental rights would be in the children's best interest. Accordingly, we overrule J.C.'s second issue.

Because "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the

33

child's best interest,"[47] we need not address J.C.'s remaining issues on appeal pertaining to sections 161.001(1)(D) and 161.001(1)(F) of the family code.[48]

### III. CONSERVATORSHIP DETERMINATION

In her third issue, J.C. argues that the trial court erred by not appointing her as a joint co-possessory conservator pursuant to section 153.191 of the family code because the trial court did not find that "her parental possession of access would endanger the physical or emotional welfare of the children."[49]

Section 153.191 mandates that the trial court appoint a "parent" possessory conservator "who is not appointed as a sole or joint managing conservator unless [the trial court] finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child"[50] Here, J.C.'s parental rights were terminated by court order divesting her of "all legal [parental] rights and duties."[51] Moreover, the term "parent," as defined by the family code, "does not include a parent to whom the parent-child relationship has been terminated."[52] Thus, section 153.191 is inapplicable because J.C.'s parental rights have been terminated.

---

[47] *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

[48] *See* TEX. R. APP. P. 47.1; *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 434 (Tex. App.–El Paso 2004, no pet.); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.–Houston [1st Dist.] 2003, no pet.); *see also In re C.C.*, No. 13-07-00541-CV, 2009 Tex. App. LEXIS 2239, at *24 (Tex. App.–Corpus Christi Apr. 2, 2009, no pet.) (mem. op.).

[49] *See* TEX. FAM. CODE ANN. § 153.191 (Vernon 2008).

[50] *Id.*

[51] *See* TEX. FAM. CODE ANN. § 161.206(b) (Vernon 2008). Moreover, former parents do not have standing to invoke a court's continuing jurisdiction over managing conservatorship issues nor do they have a right to visitation. *In re Lambert*, 993 S.W.2d 123, 132 (Tex. App.–San Antonio 1999, orig. proceeding).

[52] TEX. FAM. CODE ANN. § 101.024 (Vernon 2008).

Therefore, having determined that the evidence is sufficient to support termination of J.C.'s parental rights, we conclude that the trial court did not err by not appointing J.C. as co-possessory conservator.[53] Finally, because M.P. does not appeal the trial court's determination that he be appointed possessory conservator, and J.C. may not complain about errors that do not harm her or that only influence other's rights,[54] we cannot conclude that the trial court erred in appointing M.P. possessory conservator.[55] We overrule J.C.'s third issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

LINDA REYNA YAÑEZ,
Justice

Delivered and filed
the 7th day of January, 2010.

---

[53] Moreover, J.C. cites to no authority, and we find none, requiring a trial court to make a separate finding that parental possession or access would endanger the physical or emotional welfare of the children after termination of the parent-child relationship.

[54] *See In re D.C.*, 128 S.W.3d 707, 713 (Tex. App.–Fort Worth 2004, no pet.) (concluding that mother had no standing on appeal to raise issue concerning service by publication on unknown biological father who did not appeal); *In re B.B.*, 971 S.W.2d 160, 163 (Tex. App.–Beaumont 1998, pet. denied) (providing that mother could not appeal termination of father's parental rights when father did not appeal), *disapproved of on other grounds*, *In re C.H.*, 89 S.W.3d at 26 (disapproving formulation of standard of review).

[55] *See* TEX. FAM. CODE ANN. § 153.006 (a) (Vernon 2008) ("If a managing conservator is appointed, the court may appoint one or more possessory conservators."); *id.* § 263.404 (Vernon 2008) ("The court may render a final order appointing the department as managing conservator of the child without terminating the rights of the parent of the child. . . .); *see also id.* § 153.005 (Vernon 2008) ("A managing conservator must be a parent, a competent adult, an authorized agency, or a licensed child-placing agency.").