# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00089-CV

**Searetha Pruitt, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 395TH JUDICIAL DISTRICT
NO. 05-115-F395, HONORABLE MICHAEL JERGINS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

The Texas Department of Family and Protective Services (the "Department") petitioned for the termination of Searetha Pruitt's parental rights regarding her three oldest children, M.L., T.P., and J.P. After a bench trial, the trial court entered a final order terminating Pruitt's parental rights and naming the Department as the children's sole managing conservator. Pruitt appeals, arguing that the evidence is legally and factually insufficient to show that statutory grounds for termination exist and factually insufficient to support the finding that termination is in the best interest of the children, *see* Tex. Fam. Code. Ann. § 161.001 (West Supp. 2009), and that the trial court's conservatorship order should be reversed. We affirm the judgment of the trial court.

### BACKGROUND

Pruitt is the mother of five children, three of whom are the subject of this appeal. The Department seeks to terminate Pruitt's parental rights as to her three oldest daughters, M.L., T.P.,

and J.P. At the time of trial, M.L. was nine years old, T.P. was four, and J.P. was three.[1] Pruitt also has a son, D.P., who was one-and-a-half at the time of trial, and a baby girl, Je.P., born three months before trial.[2] The Department did not seek termination as to Pruitt's two youngest children, as D.P. is in the custody of his father, and the Department did not have conservatorship of Je.P. at the time of trial.

Pruitt's involvement with the Department began in June 2005, when the Department received a referral alleging neglectful supervision of Pruitt's daughter A.P. by her then-husband Darryl Pruitt.[3] The referral arose after A.P. died of sudden infant death syndrome while in Darryl's care. After an investigation, the Pruitts were ruled out as the cause of A.P.'s death and the case was referred to Family Based Safety Services (FBSS). While involved with FBSS, the Pruitts participated in childcare services, parenting classes, and counseling, and T.P. participated in early childhood intervention services to treat a developmental delay. These FBSS services continued until February 2007, when the case was dismissed.

During the Pruitts' initial FBSS case, the Department received two additional referrals. In April 2006, the Department received a referral for neglectful supervision after the Pruitts left M.L., then five years old, with her seven-year-old cousin. M.L. alleged that the cousin "french-kissed" her and forced his fingers into her vagina. In September 2006, the Department received another referral alleging physical abuse of M.L., T.P., and J.P. by Darryl Pruitt. According

---

[1] The facts recited herein are taken from the testimony and exhibits admitted at trial.

[2] Pruitt also had a sixth child, A.P., who has since passed away.

[3] To avoid confusion, we will refer to Darryl Pruitt by his first name.

to this referral, Darryl allegedly threw M.L. on the bed several times and called her a "crybaby." The referral also claimed that Darryl threw T.P. "too high" into the air. Neither case was investigated by the Department because the Department felt the issues could be addressed through the Pruitts' already-existing FBSS case.

After the initial FBSS case was closed in February 2007, the Department received an additional referral in March 2007 alleging the neglectful supervision and medical neglect of M.L., T.P., and J.P. by Pruitt and Pruitt's mother, Andra Crowell. The referral stated that while Crowell was supposed to be supervising the children, J.P. sustained unexplained welts on her back from T.P. with no clear explanation regarding how they occurred. As a result of this referral, M.L., T.P., and J.P. were taken into the Department's custody on March 14, 2007 and remained there until the case was dismissed on May 10.

On June 11, 2007, the Department received a referral citing neglectful supervision of M.L., T.P., and J.P. by Pruitt. The referral stated that Pruitt had not been consistently taking her medications to treat her bipolar disorder and that she allowed J.P. to cry herself to sleep.

Shortly thereafter in August 2007, the Department received additional allegations of physical neglect of M.L., T.P., and J.P. due to the condition of Pruitt's home. According to two Department caseworkers, Pruitt was living in a "filthy and roach infested" home that was "not suitable to live in," from which she was ultimately evicted. The home contained approximately ten dogs and fifteen cats, the toilets were full of feces, and the floor was covered with animal feces. A jar full of roaches was also found on the kitchen counter, clutter was piled up inside, and there were maggots in the food. A Department caseworker who saw pictures of the home testified that the home

3

was "definitely a hazard." As a result of the home's condition, Pruitt was convicted of illegal dumping and cruelty to animals and served 77 days in jail. Pruitt claims that before she was formally evicted, she and her children had moved out of the home and into her mother's house. At some point after Pruitt was evicted, the Department transferred the case to FBSS and Pruitt voluntarily placed T.P. and J.P. in the custody of their former daycare teacher.

Throughout this second FBSS case, which continued until the Department took custody of the children in August 2008, the Department became increasingly concerned about the safety of the children. Pruitt did not take her medications as prescribed by her psychiatrist, did not participate in individual counseling, and no longer wanted T.P. and J.P. to remain in their voluntary placement. Pruitt also suffered from back pain from a previous accident and, though she took pain medications and saw a pain management specialist, stated on several occasions that her pain made it difficult to care for her children. Pruitt also began talking about being "severely depressed" and thought that she needed to go into the hospital "because it was too hard to take."

In addition, Pruitt did not visit T.P. and J.P. regularly, despite being asked to do so. When she did visit, she called T.P. a "crybaby monster." T.P.'s therapist testified that T.P. "regressed" after visits with Pruitt, diagnosing her with post-traumatic stress disorder. On one occasion, Pruitt verbally assaulted a pediatrician, who in turn banned Pruitt from his office. That same day, while at a pharmacy with M.L. and D.P., Pruitt allegedly threw an item at a pharmacist when she learned that it was not free. Pruitt testified that she did not throw the item, but "placed it in the window" when she discovered she could not afford it.

4

In June 2008, the Department investigated a referral regarding sexual abuse of M.L. M.L. told the investigator that she was afraid of possible sexual abuse from Pruitt's boyfriend, James, because M.L. slept naked at night, and that he kissed her on the mouth, which made her uncomfortable. She also stated that James entered the home through a window each night, that she knew Pruitt and James took baths together, and that he washed Pruitt's private parts. Further, M.L. reported that James walked around the house in his boxer shorts, and that she had seen his genitals through his unbuttoned underwear. At trial, Pruitt denied that James entered through the window or that M.L. ever saw him in his underwear, and stated that M.L. was never left alone with James.

In the same interview, M.L. told the investigator that Darryl had opened her vagina and looked in on two occasions. She also claimed that one of Pruitt's boyfriends made her strip naked when she was two years old, saying, "He did something to me," though she could not remember any details of the incident. Pruitt testified that Darryl inspected M.L.'s vagina after M.L. had been diagnosed with a yeast infection and complained of increased pain. She also claimed that her half-sister's mother told M.L. that Pruitt's boyfriend abused M.L. when she was two years old, "that is where [M.L.] got that make-believe idea from," and that it never actually occurred.

The ultimate disposition of the investigation into the sexual abuse of M.L. was "unable to determine." According to a Department caseworker, the investigators could not contact Pruitt, and closed the case after a month of unsuccessful attempts to do so.

Also in June 2008, M.L. told investigators that Pruitt used marijuana, which James brought into the home. She told the investigator that she had seen Pruitt use "white wrapping paper, and that it wasn't cigarettes, that it was actually weed." M.L. also drew a picture of a glass pipe she

had seen in Pruitt's house. At trial, Pruitt's half-sister, Bobby Ray Davis, confirmed that Pruitt had used drugs while at home with the children.

The Department became temporary managing conservator of M.L., T.P., J.P., and D.P. in August 2008. M.L. is currently in placement with Pruitt's half-sister, Davis, T.P. and J.P. are in separate foster homes, and D.P. is in the custody of his father, Emiliano Montalbo.[4] The Department initiated a suit in December 2008 requesting termination of Pruitt's parental rights to M.L., T.P., and J.P. on the grounds that she knowingly placed the children in conditions that endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, and failed to comply with the provisions of her service plan. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O). After a bench trial, the trial court found that Pruitt's parental rights should be terminated as to all three children, and entered a subsequent judgment as well as findings of fact and conclusions of law.[5] Pruitt now appeals.

---

[4] The Department is not seeking termination as to D.P. because he remains with his father. Both M.L.'s father and T.P. and J.P.'s father have voluntarily relinquished their parental rights, making Pruitt the only legal parent of M.L., T.P., and J.P. at the time of trial.

[5] Following the close of argument, the trial court requested additional evidence, including information from the Department regarding Pruitt's medical prescriptions, the results of her most recent drug test, and the outcome of a December Department referral. Though it appears that this evidence was considered by the trial court in reaching its judgment, it was not found in the trial court's record. The Department has since filed an unopposed motion to supplement the record, attaching file-stamped copies of the missing evidence. We hereby grant the Department's motion and consider the attached documents as a supplemental record.

**STANDARD OF REVIEW**

To terminate the parent-child relationship, the factfinder must find clear and convincing evidence that (1) the parent has engaged in conduct set out as statutory grounds for termination and (2) termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see* Tex. Fam. Code Ann. § 161.001. "Clear and convincing evidence" is the degree of proof required to produce a firm belief that the Department's allegations are true. *C.H.*, 89 S.W.3d at 23.

In a termination case, we review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the factfinder's determination, and will uphold a finding if a reasonable factfinder could have formed a firm conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if it is reasonable to do so. *Id.* An appellate court should disregard evidence a reasonable factfinder could have disbelieved or found incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a finding terminating parental rights, the inquiry is whether a reasonable factfinder could form a firm belief or conviction that grounds exist for termination and that termination is in the best interest of the children. *C.H.*, 89 S.W.3d at 18-19. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so and we disregard evidence that a reasonable factfinder could have disbelieved or found incredible. *J.F.C.*, 96 S.W.3d at 266. Evidence is factually insufficient only if a reasonable factfinder could not have resolved the disputed evidence in favor of its finding and if that disputed evidence is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

7

**DISCUSSION**

In four issues on appeal, Pruitt challenges the legal and factual sufficiency of the evidence supporting the Department's statutory grounds for termination, the factual sufficiency of the evidence indicating that termination is in the children's best interest, and the propriety of the trial court's order appointing the Department sole managing conservator of the children.

***Statutory Grounds***

In her first and second issues on appeal, Pruitt argues that the evidence is legally and factually insufficient to support a finding of any of the Department's statutory grounds for termination by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(1) (requiring finding of one statutory ground to support termination order). At trial, the Department presented evidence regarding subsections (D), (E), and (O) of section 161.001(1) of the family code, which support a termination order based on clear and convincing evidence that a parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [or]
>
> . . . .
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

*Id*. § 161.001(1)(D), (E), (O).

8

The trial court found that clear and convincing evidence existed with regard to all three grounds for termination. *See id.* Only one ground is necessary to support a judgment in a parental-rights termination case. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Therefore, when termination is based on multiple grounds under section 161.001(1), as it was here, we must affirm the termination order if the evidence is sufficient to support termination based on any one of the grounds found by the district court. *Id.*

Because our analyses of subsections (D) and (E) contain common issues of law and fact, we will address both grounds together. Both subsections (D) and (E) require proof of endangerment, which is defined as exposing a child to loss or injury or jeopardizing a child's emotional or physical health. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone. *Id.* It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury, *id.*, nor must the conduct occur in the presence of the child; it may include conduct before the child's birth and both before and after the child has been removed by the Department. *In re B.B.*, 971 S.W.2d 160, 166-69 (Tex. App.—Beaumont 1998, pet. denied). Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Subsections (D) and (E) differ in that (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional well-being, while subsection (E) requires that the cause of the endangerment be the parent's conduct alone, as

evidenced not only by the parent's actions but also by the parent's omission or failure to act. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

To support its contention that Pruitt has endangered her children as per subsections (D) and (E), the Department presented evidence of Pruitt's history with illegal drugs. Dr. James Shinder, a psychologist who completed a parenting assessment on Pruitt in August 2008, testified that Pruitt had an extensive history with drugs, and continued to use cocaine and marijuana even after she became a parent. Davis, Pruitt's half-sister, testified that Pruitt has used illegal drugs while the children were home. Pruitt herself conceded that she smoked marijuana after A.P. passed away (and after she was already a parent to M.L. and T.P.), but stated that she had not used illegal drugs since. Additionally, a Department investigator testified that M.L. told her that Pruitt and her boyfriend, James, smoked marijuana cigarettes in the home. M.L. also drew a picture of a glass pipe found in the home.

A parent's drug use both before and after a child's birth is relevant to the issue of endangerment. *Dupree v. Texas Dep't of Protective & Regulatory Servs*., 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). Furthermore, evidence that a parent abused drugs while the children were in her custody supports a finding of termination. *See In the Interest of J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In the Interest of C.L.C. and C.R.D.*, 119 S.W.3d 382, 398 (Tex. App.—Tyler 2003, no pet.).

Dr. Shinder's report, admitted into evidence at trial, also indicated that Pruitt has a history of both juvenile and adult arrests, including possession of marijuana, assault and terroristic

threat, felony theft, "hot checks," and illegal dumping and cruelty to animals. Dr. Shinder testified to Pruitt's criminal history being an "extreme concern" because of the diversity of her criminal acts. Though incarceration, considered alone, does not prove endangerment, it may contribute to a finding that the parent engaged in a course of conduct which endangered a child's physical or emotional well-being. *See Boyd*, 727 S.W.2d at 533-34. Evidence of frequent arrests and incarceration may constitute grounds for termination. *See id.*

The trial court further considered Pruitt's history of mental health problems and stability issues along with the alleged emotional and physical neglect of the children which resulted. Pruitt has had a lengthy history with the Department, spanning several years, numerous referrals, and two FBSS cases. Pruitt was unemployed at the time of trial, and has moved several times since she became involved with the Department, as have her children. M.L. told a caseworker that she had already attended eight different schools. More than one caseworker testified that the Department was concerned because at times Pruitt did not take her bipolar medication and has made statements that she was "severely depressed," that "it was too hard to take," and that her back pain made it difficult to care for her children. Davis and M.L.'s counselor, Patricia Morgan, both testified that M.L. was "parentified," assuming a parental role to her younger siblings. According to Morgan, at the age of seven, M.L. prepared bottles, cooked food, and changed her siblings' diapers. Additionally, on at least one occasion, Pruitt knowingly let J.P. cry in another room until she fell asleep, refusing to attend to her.

The Department presented additional evidence that Pruitt was evicted from her home and ultimately convicted of illegal dumping and cruelty to animals because of the home's condition.

A caseworker who saw pictures of the home said that it was "definitely a hazard." Another determined it "not suitable to live in." At the time the pictures were taken, the home had a roach infestation, the toilets were full of feces, and the floor was covered with animal feces.

Pruitt argues that the photos were taken after she and the children had already moved out of the home, that two cats were left in the home to further dirty the house after Pruitt moved out, and that no evidence was presented at trial which proved that the home was a danger to the children during the time in which they lived there. However, from the evidence presented, the trial court could have rationally inferred that the condition of the home when the children resided therein was similar to the condition in which the home was photographed. The judge could have further concluded that the home environment endangered the physical health of the children. *See In re P.E.W.*, 105 S.W.3d 771, 777-79 (Tex. App.—Amarillo 2003, no pet.) (considering unsanitary conditions of home, e.g., cockroaches, dirty dishes and floors, food on floor, and un-flushed toilet, as factor in determining whether to terminate parent-child relationship); *In re K.M.B.*, 91 S.W.3d 18, 24 (Tex. App.—Fort Worth 2002, no pet.) (holding that presence of roaches, lice, animal feces, terrible odors and general filth along with admission that children were left with incapable child care supported finding that children's well-being was endangered); *Phillips v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 354-55 (Tex. App.—Austin 2000, no pet.) (holding that child may be endangered by home environment in which he is continually exposed to unsanitary living conditions).

The Department also argues that Pruitt placed her children in a dangerous environment when she exposed her children to violence and domestic fights. Davis testified that she

12

witnessed Pruitt arguing with her boyfriend on several occasions when the children were present, during which Pruitt's boyfriend referred to Pruitt as "whore" or "slut." A caseworker also testified that Pruitt verbally assaulted a pediatrician, and, later that day, threw an item at a pharmacist while M.L. and D.P. were present. Pruitt denies the latter allegation. Dr. Shinder testified that Pruitt's parenting assessment included many indications of anger-management problems, including a personality test which found that she is "somewhat immature, strongly self-focused, doesn't have much insight, overreacts and overreacts quickly without thinking and would be expected to have poor self-control in most situations."

Additionally, the Department alleges that Pruitt endangered M.L. by exposing her to Pruitt's boyfriend, James, who M.L. told Morgan climbed in through the window, walked around in his boxer shorts, kissed M.L. on the mouth, and brought marijuana into the house. Pruitt testified that M.L. lied as to all of these statements and dismissed them, stating, "[M.L. is] willing to do what she can to make sure it is just her and I in the home." Morgan also testified that M.L. told her she was sexually abused by her cousin, that Darryl had inspected her vagina, and that one of Pruitt's boyfriends had sexually abused her at age two, though she could not remember precisely how. Pruitt claims that this last allegation is a lie planted in M.L.'s head by Davis's mother.

Finally, Pruitt on many occasions knowingly left all three children with her mother, Crowell, whom Pruitt knew had a history with the Department.[6] M.L. told Morgan that Crowell had marijuana in the house and that Crowell's husband got drunk while M.L. visited. Pruitt conceded

---

[6] Pruitt was taken into the Department's custody when she was fifteen years of age and remained there until age eighteen.

that she has left her children with her mother, but characterized her relationship with her mother as "awesome" to Dr. Shinder.

Given the evidence presented at trial and considering all evidence in the light most favorable to the trial court's finding, a reasonable factfinder could have formed a firm conviction that Pruitt knowingly engaged in conduct which endangered her children and knowingly placed the children in conditions which endangered their physical or emotional well-being. Moreover, a reasonable factfinder could have resolved all disputed evidence in the Department's favor and could have reasonably formed a firm belief or conviction that statutory grounds for termination existed under sections 161.001(1)(D) and (E) of the family code. Accordingly, we conclude that the evidence is legally and factually sufficient to support the trial court's finding of clear and convincing evidence as to both of these statutory grounds for termination.[7]

We overrule Pruitt's first and second issues on appeal.

### Best Interest

In her third issue on appeal, Pruitt argues that the evidence is factually insufficient to support a finding that termination of her parental rights is in the children's best interest. *See* Tex. Fam. Code. Ann. § 161.001(2) (requiring best interest finding to support termination order). The best interest of the children is assessed using a non-exhaustive list of factors. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include (1) the children's wishes, (2) their emotional and physical needs now and in the future, (3) emotional or physical danger to the children

---

[7] As only one predicate finding under section 161.001(1) is necessary to support a termination order, we need not address Pruitt's challenges to the evidence supporting termination under subsection (O). *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

14

now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the children by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct indicating that the parent-child relationship is improper, and (9) any excuses for the parent's conduct. *Id*. at 372.

The Department need not prove all nine *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the children. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.).

The Department claims that Pruitt's past behavior, specifically her history of drug use both before and after she became a parent, long history with the Department, and chronic instability, serves as evidence that termination of Pruitt's parental rights is in the children's best interest. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied) (citing *In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied)) ("[A] fact finder may infer that past conduct endangering the well being of a child may recur in the future if the child is returned to the parent.").

Both M.L.'s and T.P.'s counselors testified that they recommend the child remain in her current placement rather than be returned to Pruitt. Morgan testified that M.L. was very angry at her mother and suffered from nightmares, anxiety, and intrusive recollections of traumatic events,

all symptoms of post-traumatic stress disorder, from her years in Pruitt's care. T.P. has also been diagnosed with post-traumatic stress disorder. M.L. was parentified, according to Morgan, and worried about her younger siblings when in Pruitt's custody. The girls' caretakers reported to their counselors that T.P. "regressed" and M.L. exhibited anxiety and acted out after visits with Pruitt. Morgan testified that M.L. was "very distressed" about the thought of going back into her mother's care, has repeatedly asked when she can be adopted by Davis, and has referred to Davis as "mom." The current caseworker, Jennifer Cook, testified that all of the children's needs are being met in their current placements. Additionally, when asked his professional opinion regarding the children's returning to Pruitt, Dr. Shinder replied:

> If the children were to be placed back with [Pruitt] and the conditions being what I saw in August of 2008, I would have grave concerns about that circumstance, because what I saw in 2008 would lead a child to have a very compromised—would have a compromised future circumstance.

Pruitt argues that since her children were taken into custody, she has completed all of the services asked of her by the Department, has recognized the part she played in her past interactions with the Department, and has worked to fix her problems. Pruitt's therapist, Laura Lee Ward Drew, testified that she believed Pruitt had effectively processed the issues that brought her to therapy, and has met all of her treatment goals. Additionally, Drew stated that she did not see Pruitt exhibit any bipolar symptoms, and did not believe Pruitt suffered from the disorder. When asked at what point she decided she had serious problems that needed to be addressed, Pruitt herself testified, "You know, I've kind of always known that they needed to be addressed. I think having my children removed this time kind of made it a little bit more serious on me . . . ."

16

The Department argues that Pruitt remains an emotional and physical danger to her children. Cook indicated that although Pruitt completed all of her services, including therapy and parenting classes, the Department still has concerns. First, Cook cited Pruitt's long history with the Department. She also noted that Pruitt completed a number of similar services during her 2005 FBSS case, after which new referrals continued, including those giving rise to this termination proceeding. Even as recently as two weeks before trial, the Department continued to received additional referrals involving Pruitt.[8] The Department also contends that Pruitt has not taken responsibility for the role that she has played in her family's recent problems. Cook testified that in September 2009, Pruitt stated that "she ha[d] never physically, emotionally[,] or sexually abused or neglected any of her children, despite what may be in court documents." Cook believed that this indicated Pruitt's failure to acknowledge any behavior patterns which may have exposed her children to risks. Dr. Shinder testified that he was concerned because, though Pruitt admitted that she had made poor choices in the past, she did not recognize how those choices affected her parenting. Additionally, Pruitt communicated to Dr. Shinder that she had no major regrets in any area of her life. He testified that such a statement indicated that she was "so lacking in insight or [she's] being so dishonest that [she] can't see the realities of [her] life situation."

In a factual sufficiency review, we must assume that the factfinder resolved all disputed facts in favor of its finding if a reasonable factfinder could do so. In considering the best

---

[8] In December 2009, the Department received a referral indicating that Pruitt left newborn Je.P. unattended in her car outside of a Department building. Pruitt testified that she left Je.P. unattended for "not even two minutes" while she brought "activities" and lunch inside for a visit with her other children. This case has since been closed due to lack of risk of abuse or neglect.

17

interest of the child, evidence of a recent turn-around in behavior by the parent does not completely offset evidence of a pattern of instability and harmful behavior in the past. *See J.O.A.*, 283 S.W.3d at 346 ("Evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *see also In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that a father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect"). Nor is a factfinder required to believe that there has been a lasting change in a parent's attitude since his or her children were removed. *In the Interest of R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (holding that jury is not required to ignore history of destructive behavior merely because it allegedly abated before trial); *In re E.S.M.*, 550 S.W.2d 749, 757 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.) (allowing judge to disbelieve mother's claims that she had "dramatically altered her life").

Given the testimony regarding Pruitt's past behaviors and the disputed evidence regarding her current fitness to care for her children, the trial judge could have resolved all disputed facts in favor of the Department and formed a firm belief or conviction that termination was in the children's best interest. Pruitt's third issue on appeal is overruled.

### Conservatorship Order

In her fourth issue on appeal, Pruitt argues that reversal of the order terminating her parental rights should also result in reversal of the trial court's appointment of the Department as sole managing conservator of M.L., T.P., and J.P., as the order was based solely on the termination of Pruitt's parental rights. Because we affirm the trial court's judgment terminating Pruitt's parental

18

rights, we have no grounds before us on which to reverse the conservatorship order.  Pruitt's fourth issue is overruled.

**CONCLUSION**

Because we find no reversible error, we affirm the judgment of the trial court.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:   December 23, 2010